IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| STEPHEN DIFLORIO, | : | |
| | : | |
| Plaintiff, | : | |
| | : | C.A. No. 1:15-cv-00186-GMS |
| v. | : | |
| | : | |
| CITY OF DOVER, et al. | : | |
| | : | |
| Defendants. | : | |

**DEFENDANTS' APPENDIX TO OPENING BRIEF IN SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT**

Dated:  July 14, 2017

**WHITEFORD TAYLOR & PRESTON LLP**

*/s/ Daniel A. Griffith*
Daniel A. Griffith, Esquire (# 4209)
Kaan Ekiner, Esquire (#5607)
The Renaissance Centre
405 N. King Street, Suite 500
Wilmington, DE 19801
Telephone:  (302) 357-3262
Facsimile:  (302) 357-3275
kekiner@wtplaw.com
*Attorneys for Defendants*

# TABLE OF CONTENTS

Deposition Transcript of Stephen DiFlorio, June 14, 2016………………… A001 – A-105

Deposition Transcript of Brian K. Berns, January 11, 2017……………….. A106 – A-026

Deposition Transcript of Jeffrey Melvin, January 11, 2017……………….. A-027 – A-031

Deposition Transcript of Brian Wood, January 12, 2017…………………… A-032 – A-033

Deposition Transcript of Mark Hoffman, January 11, 2017………………… A-034 – A-035

Expert Report of R. Paul McCauley, Ph.D., FACFE, May 15, 2017……….. A-036- A-057

City of Dover Crime Reports, March 16 – 17, 2013………………………… A-058 – A-064

*Russell v. Lowman, et al.*, C.A. No. 15-860, slip op. (D. Del. Feb. 10, 2017).. A-065 – A-083

# In The Matter Of:

*DiFlorio v.*
*City of Dover, et al.*

---

*Stephen DiFlorio*
*June 14, 2016*

---

*Wilcox & Fetzer, Ltd.*
*1330 King Street*
*Wilmington, DE 19801*
*email: depos@wilfet.com, web: www.wilfet.com*
*phone: 302-655-0477, fax: 302-655-0497*



**WILCOX & FETZER LTD.**

Original File DiFlorio v. City of Dover 06-14-16 depo of Stephen DiFlorio.txt

Min-U-Script® with Word Index

1        Q.   And I understand that this incident

2   happened outside of Smithers?

3        A.   On March 16th, yes.

4        Q.   And what time did you arrive at

5   Smithers that night?

6        A.   Around seven or eight o'clock.

7        Q.   And before you arrived there, you had

8   just gone to class and worked out, or had you

9   been to any other places first?

10       A.   No.   That's it.   And then back home to

11  get dressed, of course, and then I went there.

12       Q.   Had you had anything of an alcoholic

13  nature to drink before you got to Smithers?

14       A.   No, sir.

15       Q.   What do you recall happening when you

16  first got to Smithers?   What did you do?

17       A.   Sat down to eat.

18       Q.   And who were you with?

19       A.   Angel Clybourn, my roommate at the

20  time.

21       Q.   Do you recall what you were wearing?

22       A.   A black Nike hoodie and black jeans

23  and Timberland boots with a white T-shirt

24  underneath of my hoodie.



STEPHEN DIFLORIO                          34

1       Q.   For how long were you inside of

2  Smithers?

3       A.   Around an hour or two.

4       Q.   Did anything eventful happen while you

5  were in Smithers?

6       A.   No.

7       Q.   What did you do for that hour or two?

8       A.   We ate chicken wings and drank, maybe,

9  anywhere from two to five beers.

10      Q.   Can you be any more specific about how

11  many beers you drank?

12      A.   Four.

13           MR. CHACKER:   Hang on.   When he

14  asks you if you can be more specific, it is

15  only if you remember.

16           Do you specifically remember

17  four beers?

18           THE WITNESS:   No, I don't.

19           MR. CHACKER:   So, if he ask you

20  a question and you don't know the answer or

21  can't be more specific, just tell him.

22  BY MR. GRIFFITH:

23      Q.   Were you drunk when you left Smithers?

24      A.   No.



1      Q.   Were you buzzed?

2      A.   No.

3      Q.   Did you and Angel leave at the same

4  time?

5      A.   Yes, we did.

6      Q.   What did you do after you left?

7      A.   We went outside of the front of the

8  establishment.   Outside of the establishment,

9  an argument occurred.   There is a small

10 alleyway to the right side of Smithers.   It's

11 not really an alleyway.   It's a --

12     Q.   When you say "to the right side," if

13 you're looking at Smithers, the entrance is to

14 the left?

15     A.   Yes, sir.   And there's a little

16 walkway to go towards the back entrance and

17 the front entrance.   And an argument ensued.

18     Q.   This would have been between nine and

19 ten p.m.?

20     A.   Yes.   Around ten p.m.   Ten.   Eleven.

21     Q.   So, you and Mr. Clybourn were outside

22 of Smithers.

23          Did you walk out the front door?

24     A.   Yes.



**W&F**
**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

A-004

```
1        A.   From wrestling.

2        Q.   So, you lost your shirt, your hoodie

3    and at least one shoe while you were

4    wrestling?

5        A.   Yes.

6        Q.   How much time elapsed from the time

7    Ajax first threw a punch at you until the time

8    the police arrived?

9        A.   I don't know.

10       Q.   Do you know if it was more than five

11   minutes?

12            MR. CHACKER:  Only if you know.

13   Don't guess.

14            THE WITNESS:  I don't know, sir.

15   BY MR. GRIFFITH:

16       Q.   Was it more than ten seconds?

17       A.   Yes.  It was more than ten seconds.

18       Q.   Do you know if it was more than a

19   minute?

20       A.   No.

21       Q.   Do you know if it was more than ten

22   minutes?

23       A.   No.

24       Q.   It could have been ten minutes?
```



**W&F**
**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

A-005

BRIAN BERNS 

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
CIVIL ACTION NO. 1:15-CV-00186-GMS

- - -

STEPHEN DIFLORIO        :

- VS -          :

CITY OF DOVER, et al.:

- - -

Wilmington, Delaware
January 11, 2017

- - -

Videotape deposition of BRIAN
K. BERNS, taken pursuant to notice, held at
Silverman & McDonald, on the above date at
10:37 a.m., before Jen Szombathy, a
Certified Professional Reporter.

- - -

ACE REPORTERS, INC.
The Bourse, Suite 1030
111 South Independence Mall
Philadelphia, Pennsylvania 19106
(215) 627-6701   (866) ACE-7003
Fax (215) 627-6788

BRIAN BERNS

Page 29

1   his children up until about eight months ago.

2   It's the same now, in passing if we see each

3   other we talk.

4        Q.    Let's talk about the training you

5   received regarding use of force at the academy.

6   Tell me what your understanding of -- tell me

7   about the training you received.

8        A.    For both TASER and pepper spray

9   training, we had to be tased and pepper sprayed.

10        Q.    Let me stop you for a second.  I

11   want to know your entire use of force training,

12   not just limited to TASER and OC spray.  From

13   the beginning to the end.

14        A.    Again, for TASER and pepper spray,

15   we had to be tased and pepper sprayed.  For our

16   firearms training we went through a course on

17   how to break down a weapon.  We learned the

18   different parts of the weapon.  And then we had

19   to go through a week's course of firing our

20   firearm.  Every week for, I don't remember how

21   many weeks, we had to do what we call a D tac.

22   It was weaponless defense and we had verbal

23   judo.  That's what I remember from the academy.

24        Q.    Let's start at the end and work

BRIAN BERNS

Page 76

1          Q.      Officer, you had an opportunity to

2     read the section F, paragraphs 1 through 20, of

3     the use of force policy?

4          A.      Yes.

5          Q.      That relates to the use of the

6     TASER; is that right?

7          A.      Yes.

8          Q.      Were you trained on this policy?

9          A.      Yes.

10         Q.      Who trained you?

11         A.      Whoever was teaching in-service

12    that day.  I'm sure -- I don't want to assume.

13    During the FTO period, I'm sure it was gone

14    over.  I don't know which officer went over it

15    with me.  During in-service whoever is teaching

16    the in-service that day will go over it with us.

17         Q.      As you sit here today, do you

18    remember who the officer was that trained you

19    during the FTO training?

20         A.      No.

21         Q.      Do you actually remember receiving

22    it?  I know you say you know you received it,

23    you must have received it.

24                 But do you actually as you sit

BRIAN BERNS

Page 83

1        Q.      So that would be about 10:40?

2        A.      Correct.

3        Q.      So you were working the 7 p.m. to 7

4    a.m. shift that evening?

5        A.      That's correct.

6        Q.      You were a patrolman?

7        A.      At that time, yes.

8        Q.      Is that different than a patrolman

9    first class?

10       A.      Yes.

11       Q.      What's the difference?

12       A.      It's one higher.  Patrolman first

13   class is one rank higher.

14       Q.      What is the lowest rank?

15       A.      Patrolman.

16       Q.      How do you become patrolman first

17   class?

18       A.      You take a test and you have to

19   score a score of 70 or higher.

20       Q.      And the timing you've been on the

21   force, does that make a difference?

22       A.      Minimum three years.

23       Q.      And promotions throughout the Dover

24   Police Department, is that always a test?

BRIAN BERNS

1      Q.      So what do you remember about this

2   incident?  I'm only talking about the 16th right

3   now, the issue at Smithers.

4      A.      We got called for a fight.  I got

5   there first.  Sergeant Melvin was there

6   immediately after me.  In the alley there's

7   Smithers and then I don't know what the building

8   next to it is and there's a small little alley.

9   In that alley there was a large white male.  He

10  didn't have his shirt on.  He was bleeding from

11  his face and from his body.  And he had a large

12  contusion on his forehead.  We got called for a

13  fight.  So I started walking toward him.  He

14  made eye contact with me.  I instructed him to

15  come to me.  He ignored me, turned around and

16  started walking away.  I again instructed him to

17  come to me.  He looked at me, turned his head

18  back around and continued to walk away.  At this

19  time Sergeant Melvin came up and grabbed him to

20  stop him from walking and I believe the remark

21  was did you not hear him.  When Sergeant Melvin

22  grabbed him from where I was it looked like

23  DiFlorio was spinning to punch Melvin.  At that

24  time I tased him to make sure there was no

BRIAN BERNS

1    injury to Sergeant Melvin.

2         Q.     Is that all the details you

3    remember about the incident?

4         A.     Yes.

5         Q.     Nothing more specific than that?

6              MR. GRIFFITH:  Objection to

7         the form.  It's an unfair question in

8         terms of, you know, there's a lot of

9         details that are completely irrelevant

10        to this incident.

11             MR. CHACKER:  I'm asking him

12        for every detail he remembers is what

13        I'm asking for now.

14             MR. GRIFFITH:  Whether there

15        were stars out, whether there was

16        heavy traffic?

17             MR. CHACKER:  Every detail

18        that has any relevance -- sure.

19   BY MR. CHACKER:

20        Q.     Your attorney is concerned that I'm

21   asking you about the stars at night.  So let me

22   clarify the question.  I think you understood

23   it.  Let me clarify it anyway.

24             Are there any other specific

BRIAN BERNS

1      Q.    He wasn't yelling or doing

2   anything, he was just putting on his shoes and

3   shirtless?

4      A.    He was bloody, shirtless and

5   putting on his shoes.

6      Q.    You say bloody, I'm imagining like

7   a TV movie where you see people with blood

8   everywhere and everything.   Pictures I've seen

9   it didn't look like he had that many cuts on his

10  face.

11          Can you describe for me what you

12  mean when you say he was bloody?

13     A.    He had blood coming from his nose,

14  his hands.  I believe, I don't remember exactly,

15  there was stuff coming -- there was scratches on

16  his chest and he had a large contusion right on

17  his forehead.

18     Q.    Did you look at any photographs or

19  anything in preparation for your testimony?

20     A.    No.

21     Q.    Did anyone ever take photographs of

22  him?

23     A.    I don't know if the hospital did or

24  not.  I don't believe I did.  I don't know if

BRIAN BERNS

1     Q.     Where were his arms?

2     A.     Up and kind of out to the side.

3     Q.     Did Corporal Melvin have to slide

4  his arms underneath or between Mr. DiFlorio's

5  arms in order to get around him?

6     A.     When he grabbed him, DiFlorio's

7  arms weren't entrapped in Melvin's hold he had

8  on him.

9     Q.     Okay.  And then what happened?

10    A.     I remember hearing Jeff say, did

11 you not hear him.  And then at that time

12 DiFlorio turned his body and looked like he was

13 getting ready to punch Jeff.

14    Q.     I need to stop you there.  I'm

15 trying to visualize what you're saying and make

16 sure we all have a picture of it.

17           So after Corporal Melvin hugs Mr.

18 DiFlorio, that's when you heard him say did you

19 hear what that officer said to you?

20    A.     Yes.

21    Q.     And then you saw Mr. DiFlorio start

22 to turn?

23    A.     Yes.

24    Q.     To his left or right, if you

BRIAN BERNS

1   remember?

2        A.    I don't remember which way he

3   turned.

4        Q.    Did Corporal Melvin lose his grip?

5        A.    I didn't see the front of -- I

6   didn't see his hands.  I don't know if he had

7   initial clasp of his hands.

8        Q.    And at this point in time you don't

9   have a clear line of sight to Mr. DiFlorio; is

10  that right, based on what you testified to

11  earlier?

12       A.    That's correct.  It's myself in an

13  entanglement of Sergeant Melvin and DiFlorio.

14       Q.    When Corporal then Sergeant Melvin,

15  I'm going to call him Melvin.

16             When Melvin had this hug on Mr.

17  DiFlorio, Melvin's back was to you?

18       A.    That's correct.

19       Q.    With DiFlorio turned, he was

20  turning within the hug?

21       A.    That's correct.

22       Q.    So you would not have had a clear

23  line of sight to Mr. DiFlorio?

24       A.    I could see him, yes.

BRIAN BERNS

Page 122

1      Q.    You couldn't see his body?

2      A.    I could see him.  I could see Mr.

3  DiFlorio.

4      Q.    So then when Mr. DiFlorio turns,

5  he's now turning from his back, which is to you,

6  to his front, now his front is facing you?

7      A.    His front never faced me.

8      Q.    He didn't make it all the way

9  around?

10     A.    That's correct.

11     Q.    How close were you to Mr. DiFlorio

12  and Melvin when this was going on?

13     A.    I don't know.  Approximately 5

14  feet.  I don't know exactly how close I was to

15  him.

16     Q.    Was your TASER out at this point?

17     A.    I don't remember when I pulled my

18  TASER out.  Obviously it came out at some point.

19  I don't remember if I had it out prior to or a

20  split second.  I got it out when Jeff grabbed

21  him.  I don't remember when the TASER actually

22  came out.

23     Q.    Did you ever give a warning to Mr.

24  DiFlorio, if you don't comply, if you don't

BRIAN BERNS

1    Q.    Now, according to your incident
2  report it says DiFlorio refused to go to the
3  ground and spun his body toward Corporal Melvin
4  in what appeared to you, writer, that DiFlorio
5  and Corporal Melvin were in a physical struggle.
6  I skipped a -- I misread.  Pardon me.  DiFlorio
7  refused to go to the ground and spun his body
8  toward Master Corporal Melvin in what appeared
9  to writer -- what writer believed to be a
10 threatening gesture?
11   A.    That's correct.
12   Q.    What was the gesture?
13   A.    It looked like Melvin was getting
14 ready to get punched.
15   Q.    What about it made you think he was
16 going to get punched?
17   A.    His arms were up.  When he was
18 turned, his arms coming around toward Melvin's
19 face.
20   Q.    Wasn't Melvin holding him?
21   A.    He had him from behind, yes.  But
22 he's taller than Melvin.  And his arms weren't
23 confined to the hug that Melvin was giving him.
24   Q.    I'm trying to understand how --

BRIAN BERNS

Page 131

1    okay.  So they were literally touching and to

2    you it looked like Mr. DiFlorio -- was his hand

3    open or was it a fist?

4         A.    I don't remember what it was.   It

5    was going toward Melvin's face.

6         Q.    His face?

7         A.    Uh-huh.

8         Q.    And you don't remember whether your

9    TASER was already out?

10        A.    I can't remember if it was out yet

11   or not.

12        Q.    In the moment -- so if it wasn't

13   out, then as I understand what you're saying is

14   you saw Mr. DiFlorio turn toward Master Corporal

15   Melvin and in that instant you pulled your

16   TASER, yelled, Jeff, look out and fired your

17   TASER?

18        A.    That's correct.  If my TASER was in

19   the holster, I don't know if it was out yet or

20   not.

21        Q.    If it was in the holster, this was

22   like a split second?

23        A.    Yes.

24        Q.    Do you practice taking it out fast?

BRIAN BERNS

Page 137

1    don't remember any other part of the

2    conversation.

3        Q.    So it says rider rode in the

4    ambulance with DiFlorio to Kent General

5    Hospital?

6        A.    Yes.

7        Q.    And during the ride DiFlorio stated

8    that he had consumed alcoholic beverages and is

9    under the legal drinking age of 21?

10       A.    Yes.

11       Q.    That was at your asking him?

12       A.    Correct.

13       Q.    At any point in time did you

14   consider the fact that Mr. DiFlorio had

15   sustained a concussion or some other head injury

16   as a result of falling to the ground and

17   striking his head on the concrete?

18       A.    That's why the ambulance was there.

19   I'm not a doctor.  I don't know what happened to

20   him.  That's why we had a professional medic

21   look at him.

22       Q.    Did you consider that as a factor?

23   When you were talking to him and having

24   conversations with him, did you consider that

BRIAN BERNS

Page 138

```
1    possibility?

2         A.    No.

3         Q.    Did you play football in high

4    school?

5         A.    I did.

6         Q.    What was your position?

7         A.    Middle linebacker.

8         Q.    Once at the hospital writer and

9    Corporal Hoffman attempted to speak to DiFlorio

10   about the physical altercation that he was in at

11   Smithers.  DiFlorio was uncooperative in

12   conversing about the incident.  He was treated

13   at Kent General Hospital for contusions to his

14   head.  And results from the doctors are still

15   pending.

16              At the time you prepared this, you

17   didn't know what his final diagnosis was going

18   to be?

19        A.    That's correct.

20        Q.    Did anyone conduct any

21   investigation at the bar to find out what

22   happened in the fight?

23        A.    I don't know.  I left the bar.  So

24   I don't know what happened after that, if
```

BRIAN BERNS

Page 143

1      A.      There were no witnesses remaining.

2  While we were at the bar, I don't remember

3  exactly, something got yelled derogatory toward

4  the police officers.  I believe it was Sergeant

5  Melvin that went on the deck to address that

6  situation and everybody went inside.  There was

7  nobody left on the deck at that point to even

8  contact.

9      Q.      So the answer is no?

10     A.      No.

11     Q.      Writer obtained a warrant for

12  DiFlorio for disorderly conduct, resisting

13  arrest and underage consumption.  DiFlorio

14  stated that he would turn himself into the Dover

15  Police Department when he was released from the

16  hospital?

17     A.      Yes.

18     Q.      That's a conversation you had with

19  Mr. DiFlorio at the hospital?

20     A.      That's correct.  At the hospital

21  Corporal Hoffman and I were there for

22  approximately an hour, maybe longer.  And he was

23  blaming us for what happened to him in the front

24  of his head.  I don't know how long it took.  He

BRIAN BERNS

Page 144

1    finally calmed himself down and we were able to

2    talk to him and he was very decent.  We

3    explained what was going on.  He was very

4    apologetic for the problems that he had caused.

5    We were busy.  It was St. Patrick's Day, so we

6    were busy that night.  I remember Hoffman

7    calling Melvin and asking can we have him turn

8    himself in tomorrow instead of keeping us here

9    at the hospital.  Melvin said that's fine.

10   There's going to be a warrant for his arrest.

11   He understood.  We explained the charges.  He

12   understood.  And we gave him until tomorrow, the

13   next day when I came on at 9 o'clock to turn

14   himself in.  He said he would.  That's fine.

15   He'd have somebody pick him up from the hospital

16   and we'd see him tomorrow, then we left.

17        Q.     So did you give him any paperwork?

18        A.     There was no paperwork to give him.

19        Q.     Did you tell the hospital staff?

20        A.     We told him numerous times.  He

21   agreed.

22        Q.     He had just collapsed and hit his

23   head on concrete and was unconscious for five

24   minutes.  Did you consider the possibility maybe

BRIAN BERNS

Page 144

1    finally calmed himself down and we were able to

2    talk to him and he was very decent.  We

3    explained what was going on.  He was very

4    apologetic for the problems that he had caused.

5    We were busy.  It was St. Patrick's Day, so we

6    were busy that night.  I remember Hoffman

7    calling Melvin and asking can we have him turn

8    himself in tomorrow instead of keeping us here

9    at the hospital.  Melvin said that's fine.

10   There's going to be a warrant for his arrest.

11   He understood.  We explained the charges.  He

12   understood.  And we gave him until tomorrow, the

13   next day when I came on at 9 o'clock to turn

14   himself in.  He said he would.  That's fine.

15   He'd have somebody pick him up from the hospital

16   and we'd see him tomorrow, then we left.

17        Q.    So did you give him any paperwork?

18        A.    There was no paperwork to give him.

19        Q.    Did you tell the hospital staff?

20        A.    We told him numerous times.  He

21   agreed.

22        Q.    He had just collapsed and hit his

23   head on concrete and was unconscious for five

24   minutes.  Did you consider the possibility maybe

BRIAN BERNS

Page 145

1    he was acting coherent but wouldn't understand

2    or retain anything?

3              MR. GRIFFITH:  Object to the

4         form.  It's argumentative.

5              THE WITNESS:  No, he agreed to

6         everything we told him.

7    BY MR. CHACKER:

8         Q.    That was the end of your

9    involvement on the 16th leading into the early

10   morning of the 17th?

11        A.    That's correct.

12        Q.    Anything else you remember that we

13   haven't discussed?

14        A.    No.

15        Q.    Then we have the second incident

16   involving Mr. DiFlorio, right?

17        A.    Yes.

18        Q.    You came on, you said he had until

19   9 p.m. when you came on duty?

20        A.    1900 so he had until 7 o'clock.

21        Q.    I heard 9 p.m.  He had until 7 p.m.

22   to turn himself in?

23        A.    Correct.

24        Q.    So if we continue through your

BRIAN BERNS

Page 147

1   staying.  Melvin heard me say that over the

2   radio and said he was going to come with me.

3   When Melvin and I got to the residence we

4   knocked on the door, DiFlorio -- there was a

5   window and a door with a curtain.  He opened the

6   curtain to the window.  I saw him and

7   immediately recognized him and he shut it and

8   didn't open the door.

9        Q.    I'm going to show you what's been

10  marked as Berns-8, which is the initial crime

11  report for the second incident on the 17th.  I'm

12  going to show you a couple of photographs.

13             MR. GRIFFITH:  Are you marking

14        these?

15             MR. CHACKER:  Yes.  One is

16        marked as Berns-9, one is marked as

17        Berns-10.  This one is 9.

18             (Exhibits Berns-8, 9 and 10

19        are marked for identification.)

20  BY MR. CHACKER:

21        Q.    Is this the property you went to?

22        A.    Yes.

23        Q.    You'll see one is a close up of the

24  property?

BRIAN BERNS

1       A.      No.

2       Q.      Tell me what happened.

3       A.      So we knocked on the door.  When I

4  say we, I'm referring to Melvin and myself.  We

5  knocked on the door.  He pushed back the

6  curtain.  I immediately recognized him from the

7  previous night before as DiFlorio.  I told Jeff,

8  that's him, that's Stephen DiFlorio.  He shut

9  the curtain and never answered the door.  So we

10 knocked on the door again.  I don't remember

11 exactly how many times we knocked on the door.

12 It was numerous times and there was still no

13 answer.  So Melvin radioed can I have two more

14 officers come.  We know he's inside and he's not

15 answering the door.  I don't remember which two

16 officers came next.

17      Q.      How long did it take for the

18 officers to get there?

19      A.      I don't know.  I don't remember.

20 30 seconds maybe.  I don't know.  I don't want

21 to guess.  In addition to the two officers that

22 Melvin radioed for, two additional officers

23 showed up on their own accord.  So Melvin and I

24 stayed up front, the other officers went to the

BRIAN BERNS

1    back of the house.  That's our protocol, what we

2    do, we surround the house to make sure no one

3    can escape.  Melvin made the announcement that

4    he's going to kick the door because we have an

5    arrest warrant.  I believe he said it twice.  I

6    don't want to make an assumption to that.

7                    After DiFlorio was told that the

8    door was going to be kicked in, he opened the

9    door.  And as soon as he opened the door he said

10   what do you want.  Melvin said are you Stephen

11   DiFlorio.  He said yes.  Melvin said you're

12   under arrest.  He pulled back in the door frame

13   and grabbed onto the door frame.  Melvin grabbed

14   him at that time by his shoulder.  He wasn't

15   coming out.  I grabbed him by his other

16   shoulder.  We went to pull him out of the door

17   frame and he fell onto the ground.

18        Q.    So if we take a look at Berns-10.

19   You and Corporal Melvin were on the top landing

20   there?

21        A.    That's correct.

22        Q.    I see it looks like the door pulls

23   out to the right, the screen door, you can see

24   the hinges on the right-hand side?

BRIAN BERNS

1        Q.      At the time you removed Mr.

2    DiFlorio from the house, where were the other

3    officers?

4        A.      Around back and around the side on

5    the north side of the house.

6        Q.      What happened when you landed on

7    the ground?

8        A.      We went to take him, when I say we

9    Jeff and I, went to take him into custody.  The

10   other officers because DiFlorio was yelling, he

11   was yelling at this time.

12       Q.      What was he yelling?

13       A.      I don't remember.  I remember he

14   was screaming help at one point.  Other than

15   that, I don't remember what he was yelling.

16       Q.      Why would he scream help, do you

17   know?

18              MR. GRIFFITH:  Objection to

19         the form.  It's hypothetical.

20              THE WITNESS:  I don't know why

21         he would yell help.  Other officers

22         came around and we all were able to

23         finally take him into custody.  He

24         wouldn't give his hands up.  Myself

BRIAN BERNS

1      and numerous other officers, I don't

2      know which ones through voice

3      recognition or anything, were

4      instructing and yelling at him to give

5      his hands, we needed his hands, get

6      his hands from underneath him.  He

7      kept putting them toward his body and

8      brining his knees up to his chest like

9      he was trying to get up.

10   BY MR. CHACKER:

11      Q.      Just to be clear.  Was he laying on

12   his side in the fetal position or were his knees

13   like -- he was bringing his knees to his chest?

14      A.      His knees were on the ground and he

15   was bringing them up to his chest.  His knees

16   were actually on the ground.  He was not in the

17   fetal position.

18      Q.      Where were his hands?

19      A.      Underneath of his body.

20      Q.      Where was his head?

21      A.      It was out.  I mean, it was --

22      Q.      How did you get his hands out?

23      A.      It took us a couple minutes and a

24   couple officers but we were able to pry his

BRIAN BERNS

1    hands from underneath his body and put him on

2    his side.

3         Q.    Did anybody punch him or kick him?

4         A.    No, he never got punched or kicked.

5         Q.    Going back to the first day when

6    you took him to the hospital, did you call

7    anyone to take pictures of the prong marks or

8    any of his other injuries?

9         A.    I did not, no.

10        Q.    Did anybody come to your knowledge?

11        A.    Not that I know of, no.

12        Q.    So after you finally got his hands,

13   then what happened?

14        A.    We put him in handcuffs.  Everybody

15   moved away from the scene and we walked him over

16   to the police car and he was taken to the police

17   station for processing and then a warrant.

18        Q.    And what happened when you got to

19   the station?

20        A.    Once we got to the station.

21   Actually I was the one that drove him back.

22   Corporal Hoffman followed me.  We got into the

23   sally port.  He's on the rear of the police

24   vehicle on the right-hand side, walked around.

JEFFREY MELVIN

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
CIVIL ACTION NO. 1:15-CV-00186-GMS

-   -   -

STEPHEN DIFLORIO          :

- VS -          :

CITY OF DOVER, et al.:

-   -   -

Wilmington, Delaware
January 11, 2017

-   -   -

Videotape deposition of
JEFFREY MELVIN, taken pursuant to notice,
held at Silverman & McDonald, on the above
date at 1:47 p.m., before Jen Szombathy, a
Certified Professional Reporter.

-   -   -

ACE REPORTERS, INC.
The Bourse, Suite 1030
111 South Independence Mall
Philadelphia, Pennsylvania 19106
(215) 627-6701   (866) ACE-7003
Fax (215) 627-6788

JEFFREY MELVIN

Page 30

```
 1   on our left.
 2       Q.   Were you parked across the street?
 3       A.   Yes.  As we exit we're walking
 4   toward Smithers, there's an alley to the left.
 5   I'm assuming they were bouncers.  They appeared
 6   to be the bouncers.  They are pointing back,
 7   saying it's back there.
 8       Q.   Around the alleyway?
 9       A.   Pointing behind them.
10       Q.   If you can turn to Berns-6.  It's a
11   photograph.  If you can hold that up for the
12   camera.  Make sure you can see it.  If you need
13   to hold it to the side, you can.  If you can
14   hold it to the side of your face.
15       A.   The bouncers were coming out
16   walking that way.
17       Q.   Hold on.  We're going to zoom in on
18   the picture a little bit.
19       A.   The bouncers were coming out of
20   here and they're pointing behind them saying
21   it's back here.
22       Q.   I want to stop you again before we
23   come away from the picture.  When you entered
24   the alleyway, could you see -- in the photograph
```

Page 31

```
 1   marked as Berns-6 can you see the location of
 2   where the incident occurred?
 3       A.   No.
 4       Q.   What's the next thing that
 5   happened?
 6       A.   Officer Berns is in front of me.  I
 7   see what's identified as Stephen DiFlorio
 8   sitting on a step to the building to the left.
 9   He has no shirt on.  He was bent over.  He looks
10   at us and gets up and walks away.
11       Q.   I'm going to stop you for a second
12   there.
13            The lighting was all right for you
14   to see him?
15       A.   Yes.
16       Q.   Because it was nighttime?
17       A.   Yes.
18       Q.   What was the weather like?
19       A.   I don't recall.
20       Q.   Was it raining?
21       A.   No.
22       Q.   So it was a clear enough night that
23   you could see?
24       A.   Yes.
```

Page 32

```
 1       Q.   You enter this alleyway, you're
 2   behind Officer Berns?
 3       A.   Yes.
 4       Q.   You can see over him?
 5       A.   To the side of him, yes.
 6       Q.   Now, when you say there's another
 7   building.  If we hold up that picture again.
 8   The building where you can see the door where
 9   your finger is pointing?
10       A.   Yes.  It goes to the back and
11   there's steps and another door on the side where
12   he was sitting on the steps.
13       Q.   You could see him clearly the
14   minute you entered the alleyway?
15       A.   When you're entering the alleyway
16   you're looking, there's hundreds of people that
17   are on the deck that are just out and about.
18   It's St. Patty's Day.  He was specifically
19   sitting there with no shirt.  We get called for
20   a fight, it's probable.  He was sitting to our
21   left.
22       Q.   I read some paperwork about he was
23   putting his shoes on.  Did you see that?
24       A.   I know he was bent down.  He was
```

Page 33

```
 1   sitting down bent forward, then he stood up and
 2   walked away.
 3       Q.   So there was no fight going on?
 4       A.   No.
 5       Q.   There was no threat, what appeared
 6   to be an immediate threat to you of any kind?
 7       A.   No.
 8       Q.   Tell me what happened.
 9       A.   Officer Berns told Mr. DiFlorio
10   twice to stop.  He did not stop.  He was walking
11   away with his back toward us.  I walked past
12   Officer Berns.  I was walking quickly, not
13   running.  I grabbed Mr. DiFlorio around the
14   waist.  My face into his back around his waist.
15   His arms are above me and pick him up.  And as I
16   pick him up to turn him around, I said did you
17   hear what he said.  And I went to sit him back
18   on the seat when I heard the TASER get deployed.
19            When I turned him, his body is
20   turning this way.  I see the cartridge in
21   between my arm, which shocked me.  I thought I
22   got tased.  When I let go, that's when he fell
23   and in the grass were concrete pillars, the back
24   of his head hit the concrete.
```

JEFFREY MELVIN

1  Q.   Let's step back for a minute.  How
2  long did it take for all of this to happen?
3  A.   Less than 30 seconds.
4  Q.   So from the moment you walked into
5  that alleyway to the moment he was tased and hit
6  his head, you think about 30 seconds?
7  A.   From the time I grabbed him less
8  than a minute.
9  Q.   For the whole incident?
10  A.   Yes.
11  Q.   You heard Officer Berns say he said
12  come here; is that right?
13  A.   Yes.
14  Q.   Is that what you recall him saying
15  or do you recall him saying something else?
16  A.   I specifically heard him give him
17  two commands, come here, get over here, he told
18  him twice.
19  Q.   Now.  Those commands occurred
20  before you approached.
21       Did they occur before you
22  approached Mr. DiFlorio?
23  A.   Yes.
24  Q.   And where were you in relation to

Page 34

1  who appeared to be in a fight, which is
2  aggressive behavior.  In my past experience, one
3  specific incident where I approached somebody
4  from behind and said, hey, turn around, I got
5  scratched in the face.  So that was never going
6  to happen again.  Given those factors, a fight,
7  he's very large, he has no shirt on, that's
8  aggressive behavior.  That's why I did the
9  decision I made.
10  Q.   Again, I understand.  How wide is
11  the alleyway approximately to your recollection?
12  Could you fit four or five people across, one
13  person?
14  A.   Can I show the picture?
15  Q.   Sure.
16  A.   Behind here is a parking lot, I
17  don't know how far it goes back, then it opens
18  to a parking lot and then the deck to Smithers
19  is behind or across from it.
20  Q.   In the area where he was sitting,
21  would you say it's as wide as we are distance
22  from each other?
23  A.   I would say as wide as this room
24  approximately and then the parking lot would

Page 36

1  Officer Berns when those commands were given,
2  next to him, behind him?
3  A.   Right behind him.
4  Q.   Did he have his TASER out?
5  A.   No.
6  Q.   From the time Officer Berns gives
7  the second command to come here or whatever he
8  said, it's my understanding at that point you
9  walked past him and approached Mr. DiFlorio?
10  A.   Yes.
11  Q.   So you walked faster, you sped up
12  to catch up to Mr. DiFlorio?
13  A.   Yes.
14  Q.   At that point in time up until the
15  time you touched Mr. DiFlorio, before you
16  grabbed him, did it appear to you he posed a
17  threat to you?
18  A.   He could have.
19  Q.   Did it appear to you that he posed
20  a threat to you?
21  A.   He could have.  It was my
22  perception he could have.
23  Q.   How?
24  A.   He's a large male with no shirt on

Page 35

1  open up.
2  Q.   Where this occurred you weren't by
3  the parking lot, right?  You were in between the
4  two buildings?
5  A.   Yes.  When he started walking away,
6  it opens up.
7  Q.   So at the time when you went to
8  grab him, was it in the opened up area?
9  A.   To the left it opens up, yes.  But
10  he's right by the deck of Smithers.
11  Q.   He had moved closer to Smithers?
12  A.   Yes.
13  Q.   And to your left there was a big
14  open space?
15  A.   Yes.
16  Q.   When you heard Officer Berns
17  describe what he saw, that he commanded DiFlorio
18  to come here and Mr. DiFlorio made eye contact
19  and then walked away.
20       Do you remember that?
21  A.   Yes.
22  Q.   Is that consistent with your
23  memory?
24  A.   Yes.

Page 37

10 (Pages 34 to 37)

JEFFREY MELVIN

1    Q.   That's when you had a conversation
2  about why he fired his TASER?
3    A.   Somewhat, yes.
4    Q.   You're smiling.
5    A.   I wasn't happy because I almost got
6  tased. I didn't know his point of view.
7  Initially I'm upset.
8    Q.   What did you say to him? You can
9  use the language.
10   A.   I said what the fuck is wrong with
11  you. He looked at me. I said, you know you
12  almost fucking tased me. He said I thought he
13  was going to hit you, which is the first time I
14  put myself in his shoes. That's what you have
15  to do as a supervisor. I said what do you mean.
16  He said when you picked him up his arms looked
17  like he was hitting you. I can't argue
18  someone's perception of what they perceived at
19  that time. That's what he perceived.
20   Q.   Did you say anything else to him?
21   A.   I think the next night I talked to
22  the shift. I said at no point are we going to
23  tase anyone when two officers are dealing with a
24  subject, unless someone is yelling for you to

Page 62

1  tase so this doesn't happen again.
2    Q.   Did you tell him -- did you say
3  anything to him like you didn't even warn me you
4  were going to do it?
5    A.   I think he told me that he told me
6  to watch out. I couldn't hear.
7    Q.   If there are multiple officers at
8  the scene like here where there are at least
9  two, possibly more officers in the vicinity of
10  where this incident occurred, should the
11  officers rather than firing the TASER, should
12  the officers all try to use physical force to
13  stop any incident?
14       MR. GRIFFITH: Objection.
15       Again, it seeks an expert opinion from
16       a fact witness.
17       THE WITNESS: It's up to the
18       officers what they choose.
19  BY MR. CHACKER:
20   Q.   Let's talk about the next incident.
21  The next time you became involved with Mr.
22  DiFlorio was Sunday evening after you learned
23  that he hadn't turned himself in?
24   A.   Yes.

Page 63

1    Q.   Tell me about that.
2    A.   He doesn't turn himself in. I
3  think Officer Berns and I had a conversation. I
4  think he told me he was going to the hospital to
5  do follow up because there at the hospital he
6  got an address 400 North New Street. I don't
7  know the exact.
8    Q.   Sorry to interrupt you. He told
9  you that he got the address from the hospital?
10   A.   Yes, because whatever the initial
11  documents were was either Wesley or Pennsylvania
12  address, but Mr. DiFlorio told the nurse the 400
13  North New address. We don't ever send an
14  officer by himself to execute a warrant. So I
15  said I'm going with you. We parked on North New
16  Street, go up to the house.
17   Q.   Lights off or lights on?
18   A.   I don't recall. I know it was
19  around 8 o'clock on the 17th. I don't know if
20  it was real dark or getting dark. Knocked on
21  the door, he looked through the curtain. He
22  looked like the guy we dealt with before. And
23  he refused to answer the door. As a supervisor
24  I called for more officers. But other officers

Page 64

1  showed up and we surround the house.
2    Q.   What happened next?
3    A.   Once officers got in place, I said
4  Mr. DiFlorio, you're going to open the door or
5  we're kicking it in. Still no response.
6  Smelled marijuana around the front of the house.
7  It appeared it was coming from inside. Told him
8  again, I said, I'm kicking the door in. Then he
9  opens the door. He said, what do you want. I
10  said, are you Stephen DiFlorio? He said, yes.
11  I said, you're under arrest. And he reached
12  back and we grabbed him.
13   Q.   Did you grab him first or did he
14  reach back first?
15   A.   I said you're under arrest. I
16  don't know if he said, no, I'm not. We grabbed
17  him. Honestly we don't want to go in -- I don't
18  know what's in his house. When I grabbed him to
19  pull him out, he's pulling me in, that's when
20  Officer Berns grabbed his left side and we
21  pulled him out and we went off the steps.
22   Q.   How did you go off the steps? You
23  didn't take him down the steps. He missed all
24  the steps altogether, right?

Page 65

17 (Pages 62 to 65)

JEFFREY MELVIN

1    A.   It was an accident that we slipped
2  off the steps.  Thank God we didn't hit the
3  bricks.  We landed in the grass.  It was
4  fortunate for all three of us.
5    Q.   How did he land?
6    A.   I think he landed on his shoulder.
7  This area here, then his stomach.  He had his
8  arms underneath of him.
9    Q.   Then what happened?
10   A.   I was up by his head area.
11 Officers converged onto him.  Once we get his
12 arms out, I rushed into the house.  It was
13 myself and another officer.  I know there was
14 two of us that went in the house, contacted an
15 unknown black male that was in the bathroom.  It
16 appeared that he got in the shower like he
17 didn't know what was going on and we found --
18   Q.   Why do you say with quote fingers?
19   A.   Because the entire time -- looking
20 back, it doesn't appear he was in the shower the
21 entire time.  Basically if he's in the shower,
22 no one is going to know what was going on,
23 because we found burnt roaches of marijuana in
24 the house.  That's the impression I got.

Page 66

1    Q.   You don't know whether he had been
2  in the shower or not?
3    A.   It was my impression he wasn't.  He
4  happened to run in there and turn the shower on.
5  And he was in there with the door shut when we
6  walked in.
7    Q.   Anyone else in the house?
8    A.   No.
9    Q.   It was after Mr. DiFlorio was
10 handcuffed that you went into the house?
11   A.   I believe once they put the
12 handcuffs on him, I went in the house.
13   Q.   Did you say anything to Mr.
14 DiFlorio while he was on the ground?
15   A.   Did I say anything?  Not that I
16 recall.
17   Q.   You heard Officer Berns testify Mr.
18 DiFlorio was yelling help multiple times.
19        Did you hear that?
20   A.   I do not recall that.
21   Q.   Did you punch Mr. DiFlorio or kick
22 him at all?
23   A.   No.
24   Q.   Did you use any pressure points to

Page 67

1  get his arms out?
2    A.   No.
3    Q.   Did you tell him anything like give
4  me your arms or anything like that?
5    A.   I think we're yelling put your
6  hands behind your back.
7    Q.   Are there a lot of people standing
8  around watching this?
9    A.   Like a crowd?
10   Q.   Yes.
11   A.   No.
12   Q.   Was the street blocked off?
13   A.   It may have been blocked off with
14 other police cars responding.  We wouldn't have
15 blocked the street off.
16   Q.   Not initially?
17   A.   Yes.
18   Q.   You don't remember?
19   A.   No.
20   Q.   Were you involved in transporting
21 Mr. DiFlorio back to the station after the
22 incident?
23   A.   No.
24   Q.   Once this incident was over, what

Page 68

1  did you do?
2    A.   I may have gone back and told
3  Sergeant Bernat, briefing again what happened.
4  I never had any other contact with it.
5    Q.   Let's take a look at your interview
6  from internal affairs.
7        The first question I'm going to
8  ask you is, you had an opportunity to read your
9  interview?
10   A.   Yes.
11   Q.   Is there anything about the
12 information in this document that you feel is
13 incorrect or would like to change?
14   A.   I think it's pretty much what I
15 testified to.
16   Q.   There's nothing you want to change?
17   A.   No.
18   Q.   Let's start with the top.  I'm
19 going to go through it.  I want to make sure.
20 If you've testified about it already, we'll
21 confirm that's what you testified to, okay?
22   A.   Yes.
23   Q.   On May 20, 2013, it's a couple
24 months after this, that's when you were

Page 69

18 (Pages 66 to 69)



BRIAN WOOD

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
CIVIL ACTION NO. 1:15-CV-00186-GMS

\-    \-    \-

STEPHEN DIFLORIO     :

    - VS -      :

CITY OF DOVER, et al.:


\-    \-    \-


Wilmington, Delaware
January 12, 2017

\-    \-    \-


     Deposition of BRIAN WOOD,
taken pursuant to notice, held at Silverman
& McDonald, on the above date at 11:05 a.m.,
before Jen Szombathy, a Certified
Professional Reporter.


\-    \-    \-


ACE REPORTERS, INC.
The Bourse, Suite 1030
111 South Independence Mall
Philadelphia, Pennsylvania 19106
(215) 627-6701  (866) ACE-7003
Fax (215) 627-6788

BRIAN WOOD

Page 30

1        A.      While I'm at the back of the

2    residence, I believe they were knocking on the

3    door.   That's when DiFlorio I guess answered the

4    door.   That's when whatever happened happened.

5        Q.      What's the next thing you saw?

6        A.      I heard the commotion.   I had to

7    make my way around the fence, went outside and

8    they're all on the ground trying to get his

9    hands free.

10       Q.      Who is they're all on the ground?

11       A.      I don't remember who had hands on.

12   Obviously Melvin and Berns would have been

13   there.   I don't know who else would have been

14   there.

15       Q.      And what did you observe?

16       A.      Just that Mr. DiFlorio had his arms

17   up underneath his body.

18       Q.      How was he on the ground?   Was he

19   on the grass or the concrete?

20       A.      He was on the grass I believe.

21       Q.      If you're looking at the house, was

22   he to the right or left?

23       A.      I thought he was out front.

24       Q.      He is out front.

MARK HOFFMAN

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
CIVIL ACTION NO. 1:15-CV-00186-GMS

—   —   —

STEPHEN DIFLORIO        :

        — VS —            :

CITY OF DOVER, et al.:


—   —   —


Wilmington, Delaware
January 11, 2017

—   —   —


Videotape deposition of MARK

HOFFMAN, taken pursuant to notice, held at

Silverman & McDonald, on the above date at

3:12 p.m., before Jen Szombathy, a Certified

Professional Reporter.


—   —   —

ACE REPORTERS, INC.
The Bourse, Suite 1030
111 South Independence Mall
Philadelphia, Pennsylvania 19106
(215) 627-6701  (866) ACE-7003
Fax (215) 627-6788

MARK HOFFMAN

1      Q.   I'm trying to figure out whether
2  you were across the street.
3          You said you could see Mr.
4  DiFlorio from across the street and down the
5  alley?
6      A.   I don't recall where I was parked.
7  I recall arriving on scene, getting out of the
8  patrol cars, seeing the officers approaching Mr.
9  DiFlorio. I never saw Mr. DiFlorio sitting down
10 at any point.
11     Q.   Okay. And the first time you saw
12 Mr. DiFlorio when he was walking away, how far
13 away were you from the closest officer?
14     A.   When I observed Officer Melvin
15 approaching DiFlorio, I was probably 20 feet
16 approximately behind him.
17     Q.   So farther than this room?
18     A.   Within reason, yes. Officer Berns
19 was to his left and my left as well.
20     Q.   And in front of you?
21     A.   And in front of me.
22     Q.   Approximately how far away?
23     A.   I would say -- I don't know
24 approximate distance. Between myself and

Page 18

1  Officer Melvin.
2      Q.   How close was Officer Berns from
3  Officer Melvin?
4      A.   If I was 20 feet away, I'd
5  approximate 10 to 15 feet maybe.
6      Q.   You from Officer Berns would be
7  about as far as we are approximately?
8      A.   Approximately, yes.
9      Q.   Understand these questions I'm not
10 asking you for an exact number because I don't
11 think you can give it to me without a measuring
12 tape. I'm asking based on your life experience
13 what your best approximation is.
14     A.   I would say that's correct.
15     Q.   That would make us about 7 feet
16 away?
17     A.   Correct.
18     Q.   Tell me what you saw at that point
19 in time. Now you're observing Officer Melvin
20 physically approach, physically touch or grab
21 Mr. DiFlorio?
22     A.   Yes. So I observed Officer Melvin
23 approach Mr. DiFlorio from behind. He grabbed
24 him and until today I had no idea he actually

Page 19

1  picked him up. My perception was he grabbed him
2  and Mr. DiFlorio's arms raised up pretty quickly
3  and I observed Mr. DiFlorio turn to the right
4  and his arms kind of flail to the right. And
5  what I assume at that point was Mr. DiFlorio was
6  coming across with his right arm in an attempt
7  to strike the officer.
8      Q.   So like a back arm? I'm trying to
9  understand.
10     A.   Maybe like an elbow.
11     Q.   Did it look like an elbow or did it
12 look like his arms just came up?
13     A.   His arms were up and it was kind of
14 this jerky reaction toward the right.
15     Q.   Okay. Then what happened?
16     A.   At that point I heard the pop of
17 the TASER and then Mr. DiFlorio fell backwards
18 and struck his head on a piece of concrete. I
19 believe it was part of a sidewalk that was
20 broken up.
21     Q.   Did you hear Officer Berns say
22 anything before he deployed the TASER?
23     A.   He made some mention of TASER or
24 watch out TASER, something along those lines. I

Page 20

1  do recall hearing the word TASER during that
2  period.
3      Q.   What documents did you review in
4  preparation for your testimony?
5      A.   I refreshed myself on use of force
6  policy and read my testimony in the internal
7  affairs investigation.
8      Q.   Did you read the entire internal
9  affairs investigation or just your testimony?
10     A.   My testimony.
11     Q.   Why did you feel you needed to be
12 refreshed on the use of force policy?
13         MR. GRIFFITH: Objection to
14     the form. Question implicates
15     attorney-client privilege. Instruct
16     him not to answer.
17         MR. CHACKER: I don't see how
18     it implicates -- it's a question of
19     why he -- I'm asking him why he felt
20     he needed to. How can you instruct
21     someone not to answer? If he didn't
22     feel he needed it -- if you told him,
23     it's not counseling. The
24     communication is what he discussed,

Page 21

6 (Pages 18 to 21)

Dover Police Department





### General Order 1.3
### USE OF FORCE AND FIREARMS POLICY

I.   PURPOSE

The purpose of this order is to promulgate to all sworn personnel the general rules of policy and procedure dealing with matters related to the use of force by sworn members of this Department. Although other directives may potentially deal with the use of force issues, this order shall serve as the primary document addressing use of force by members of this Department.

II.   POLICY

A.   It is the policy of this Department that personnel of this Department shall use only those types and amounts of reasonable force immediately necessary to affect the lawful objectives of the Department.

B.   Each officer is equipped with a firearm and other items of equipment to defend themselves and/or others against force up to and including deadly force.

C.   The officer obtains the right to use force, including deadly force, in certain situations from 11 Delaware Code Sections 461-471, generally, and Section 467, specifically.

D.   This Department recognizes the legal standard set forth by the Delaware Legislature regarding the use of force/deadly force. All officers must completely familiarize themselves with these sections of the law. However, in a situation which may require the use of force, officers must not only consider the legality of the act but, moreover, the absolute necessity of their actions.

III.   FORCE OTHER THAN DEADLY FORCE

An officer is issued the following items of equipment to assist him in making a lawful arrest when resistance is encountered to prevent an escape or for the purpose of protecting himself or a third party from bodily harm. An officer will use only that amount of reasonable force immediately necessary to effect lawful objectives.

A.   Baton

1.   All officers of the Department will be issued Monadnock auto locking batons.

2.   The baton is a defensive weapon issued to Department members for use in situations when other defensive equipment is not effective or its use is impractical.

3.   The baton should be carried on the person of all uniformed personnel upon exiting their police vehicle to answer calls for service and/or vehicle stops.

4.   Non-uniform personnel when performing operationally oriented functions will carry their baton in their police vehicle.

A-039
DOV00000027

5. Accepted Uses

The baton is to be used by all officers in the following manner for defense from and to counter attacks of violent, aggressive, or unruly persons:

a. Blocking blows and kicks of your opponent.

b. Striking blows to those places on your opponent's body where bone is close to skin (excluding the head and face), such as elbow, shin, knee, ankle, etc.  Short swing and back swing blows may also be directed to the thick muscle groups of the buttocks, thigh, and calf.

c. Delivering jabs to soft tissue area of the opponent's trunk and back.

d. For use as a move-along, come-along, elbow-locking, handcuff, and other legitimately recognized uses for the baton.

6. Unacceptable Uses

The following uses of the baton shall be avoided whenever possible:

a. Blows to the opponent's head and face.  The opponent could be killed instantly instead of merely being brought under control.  Blows delivered to the head place the baton in a position which is vulnerable to counterattack or a disarming movement.  The opponent could very well seize the baton and disarm the officer.

b. Blows to any part of the opponent's body above the nipples of the chest are prohibited and shall be outside the policy of this department, for reasons set forth above.

c. The baton shall not be used as a strangling device.  Strangle holds are dangerous and should not be considered for use unless as a last resort in controlling an opponent who has either gone berserk or is extremely violent.   An officer must exercise good judgment in utilizing any techniques to strangle an opponent.  In most instances strangle holds, whether a baton is used or not, shall be considered outside policy.

B. Flashlight

1. All officers of the Department will be issued Stinger flashlights.

2. Members who possess other alternative flashlights may use them in place of the department issued flashlight.

3. The primary application of the flashlight is as a source of illumination.

4. It is not a weapon, nor is it intended to replace the baton, although there may be exceptional situations where it may be necessary to use the flashlight as a defensive instrument.

A-040

DOV00000028

Dover Police Department

5.    When a situation of this nature arises, the flashlight shall be used in the same manner and under the same rules as those governing the baton.

6.    The flashlight shall be carried in the vehicle on all shifts.

C.    Handcuffs

1.    Officers of this Department are issued Smith and Wesson and/or Peerless handcuffs to be used to restrain and secure persons in police custody and not as a defensive weapon.

2.    The Department recognizes that it cannot predict each and every situation that will require the use of handcuffs.  The final decision as to the need for the use of the handcuffs is most frequently left to the best judgment and discretion of the arresting or transporting officer's assessment of the prisoner and situation.

3.    Department members will, however, be held responsible and strictly accountable if an escape is effected due to the lack of use of handcuffs.

4.    Handcuffs shall be used in the following situations:

a.    All felony arrests.

b.    All persons who are known to have resisted arrest or have assaulted police officers in the past, regardless of present charge.

c.    All unruly, hostile, and extremely argumentative persons regardless of present charge.

d.    All persons who the arresting officer has reason or should have reason to believe will attempt to escape or cause harm to themselves or others regardless of the present charge.

e.    In all cases where the prisoner is or has been violent, a second officer will ride in the left rear seat so as to protect the driver of the police vehicle, provided, of course, that such a second officer is available.

5.    Practices to be avoided when using handcuffs:

a.    Do not handcuff a prisoner to a fixed object (sign post, automobile bumper, etc.).

b.    Do not handcuff a prisoner's hands in front (unless they are suffering from a deformity or other disability).

c.    Do not handcuff yourself to the prisoner.

d.    Do not use the handcuffs as a "come-along".

A-041

DOV00000029

Dover Police Department

  e.  Do not forget to double lock and check the handcuffs after they have been applied.

  f.  Do not search a prisoner before handcuffing them unless an unusual situation dictates otherwise.

  g.  Do not intentionally tighten the handcuffs in such a fashion so that they pinch the skin, restrict circulation, or intentionally cause the prisoner unreasonable discomfort or pain.

D.  <u>Knives</u>

  1.  Knives are not issued by the Department. However, officers, at their option, may carry a folding blade pocket knife on their person as permitted under State Law.

  2.  If carried, the blade will not be longer than 3" in length, as legally allowed by State Law.

  3.  Department members are given the authorization to carry a knife for use in situations that may arise in the performance of their duties requiring a cutting edge.

  4.  The knife is not to be carried for the specific purpose of using same as a defensive weapon.

E.  Chemical Agents (Capstun)

  1.  All officers of this department are issued Oleoresin Capsicum, "CAPSTUN", First Defense X2, 4% strength.

  2.  Officers are hereby authorized to use Capstun in certain circumstances, after attending an authorized training session detailing its usage.

  3.  This chemical agent is to provide protection from bodily harm when making an arrest or apprehension, or when subduing a combative, aggressive or resisting person.

  4.  Capstun will be used only after reasonable efforts to control a violent subject have failed, or when such effort would clearly be futile. The amount used will be only that amount necessary to subdue the subject.

  5.  Capstun will <u>not</u> be used against passive resistors, nor as a "come-along".

  6.  Capstun issued to officers of the Dover Police Department is not alcohol based and therefore, not considered to be flammable when used in conjunction with an electronic stun device or in proximity to an open flame source.

A-042

DOV00000030

**Dover Police Department**

7. Capstun will not be used in a hospital or medical facility setting

8. Unauthorized use of Capstun will subject the officer to the same disciplinary action as would the use of any unauthorized or unnecessary force.

F. Electronic Control Device  (Taser)

1. All officers of the department are issued a Taser. The Taser is a handheld weapon which deploys two (2) probes from a replaceable cartridge. These probes are connected to high voltage insulated wires transmitting powerful electrical pulses into the body of the target. The Electro-Muscular Disruption (EMD) technology uses a five (5) second burst of electrical signal to temporarily override the central nervous system and directly control the skeletal muscles.

2. The Taser is a defensive instrument listed in the force continuum at the same level as chemical agents (CapStun). An officer justified in using chemical agents is justified in using the Taser.

3. The Taser is categorized as less-lethal force and may be used to protect the officer from bodily harm when making an arrest or apprehension and to control a dangerous or violent subject when lethal force does not appear to be justified; attempts to control the subject by other conventional tactics have been ineffective; or there is a reasonable expectation that it is unsafe for officers to approach within contact range of the subject.

4. Only officers who have received the required training and certification by a Taser certified instructor are authorized to carry or deploy the weapon. Re-certification will occur annually by a certified instructor. During the recertification process the Taser will be inspected by the certified instructor.

5. The Taser will be stored in the accompanying holster and when worn on the duty belt it shall be carried on the support side of the officers uniform allowing for a cross draw by the officer's strong hand.  The weapon will be carried fully armed with the safety on, in preparation for its use in appropriate circumstances.

6. Officers issued a Taser will maintain the weapon in a high condition of cleanliness and readiness for use and will notify their immediate supervisor should a problem with the weapon occur.  If the weapon is deemed unsafe it will immediately be removed from service. Certified Taser instructors will examine Tasers found to be defective and determine the best course of action to repair or replace the Taser.

7. Officers shall be issued one spare cartridge, and have it accessible in case of cartridge failure or the need for reapplication.

8. The Taser may be deployed to safely effect the arrest of a noncompliant individual, or an individual who has used or threatened to use physical force, when there is a reasonable expectation the officer or the offender would be injured without the use of the Taser.

A-043

DOV00000031

**Dover Police Department**

9.    The Taser shall not be unnecessarily discharged.  No horseplay of any kind involving the use of the Taser will be tolerated and is considered a violation of policy.  Officers are permitted to test the Taser daily to insure readiness.

10.   In determining whether to discharge the Taser, officers must consider the reasonableness of its use to include:

a.   The level of force being confronted

b.   The subject's location (elevated positions) and the possibility of secondary injuries as a result of falling to the ground while being tased.

c.   The subject's age. The use of the Taser on small children and the elderly will normally be considered outside of policy. Elderly are defined as senior citizens who are feeble and/or infirm. Small children are defined as children of elementary school age.

d.   Any known medical conditions, i.e. pregnancy or heart problems.

e.   In any instance where the subject has come in contact with flammable liquids or is in a flammable atmosphere (gas pumps, clandestine drug labs, etc.).

f.   In a situation where deadly force is clearly justifiable unless another officer is present and capable of providing deadly force cover to protect the officer and /or any civilians present.

11.   The Taser will not be used against passive, non-violent protesters.

12.   Whenever possible a verbal warning shall be given to the suspect prior to deployment of the Taser. This warning will also serve notice to other officers in the area that the Taser is being readied for deployment.

13.   Electrical charges may be released from the Taser in two ways:

a.   Firing two probes from distances up to twenty-five (25) feet from a disposable cartridge which is connected to the Taser by insulated wires and releases electrical discharge pulses into the body.

b.   Drive Stun, which is when the Taser is applied directly to the body, consistent with pain compliance measures.

14.   Upon firing the device, the officer shall energize the subject the least number of times and no longer than necessary to accomplish the legitimate operational objective.  Each Taser has a data port that stores the date and time the weapon is fired.  The data protects the officer from claims of excessive force by documenting each firing accurately and completely.  The information contained in the data port can be accessed by Internal Affairs.

A-044

DOV00000032

Dover Police Department

15.   Each discharge of the Taser against a subject shall be documented on a Dover Police Department Use of Force Report and submitted through the chain of command to the Deputy Chief of Police. At a minimum the report should include:

a.   The number of times the subject was energized, detailing the use of the probes and/or drive stun(s).

b.   Any secondary injuries as a result of using the Taser.

c.   The location where the probes hit the body and approximate distance between the probes.

d.   The serial number of the cartridge.

16.   The Taser is designed for temporary immobilization of a subject. It should not cause any significant injury. However, a subject may receive secondary injuries as the result of falling when the subject is immobilized.

17.   If the subject complains of medical problems or the officer observes any injuries to the subject, appropriate medical aid must be rendered and photographs will be taken to document visible injuries.

18.   If the probes embed into soft tissue areas such as the neck, face, eyes, breasts, or groin the officer shall require the subject be treated at the nearest medical facility or by responding Medics or Paramedics.   The probes shall only be removed from these areas by medical personnel. Removal from other areas shall be at the discretion of the officer.

19.   Once the probes have been removed by the officer, the entry sight will be treated with antiseptic and band-aids applied if necessary.

20.   The arresting or transporting officer will make continuous observations of an individual in their custody who has received an electrical pulse from a Taser, for signs of distress.  This period of observation will be, at a minimum, 20 minutes.  Individuals who display shortness of breath, tightness in the chest or symptoms not consistent with the situation, shall be transported immediately to a medical facility or paramedics may be summoned to the cell block.  Following the 20 minute observation period, the desk officer will be informed when a subject has received an electrical pulse from the Taser and placed into the cell block for arrest processing.

21.   Post Deployment procedures:

a.   The spent cartridge and probes should be collected and preserved as evidence.  Use caution when collecting the probes because they have penetrated the skin of the subject.

i.   The insulated leads "wires" should be saved and kept intact if possible.

A-045

DOV00000023

Dover Police Department

ii.   The probes should be placed back into the holes in the cartridge, point first.

iii.   Evidence tape should be placed over the face of the cartridge to secure the probes in the holes.

iv.   The packaged device should be placed in an evidence bag with the wires.

v.   The bag should then be processed as an individual piece of evidence under the same CR number as the incident in which the Taser was deployed.

vi.   The bag shall be labeled with a biohazard liable and evidence tag, then submitted to evidence.

vii.   In the event the Taser is used during a deadly force incident or any incident where a death occurs, the cartridge wire (every effort should be taken to keep the wires intact), doors, and AFID (antifelon identification) which can be located shall also be collected and submitted with the cartridge and probes.

22.   It is recommended prior to each shift the officer test his taser to ensure the equipment is working properly. The officer should remove each cartridge from the taser and point the weapon in a safe direction. Once the taser is pointed in a safe direction the officer should pull the trigger to the rear and allow the taser to cycle for five seconds. If the taser is working properly the officer should return the two cartridges back to the taser and holster the weapon in a safe manner. If the taser is not functioning property during the testing phase the officer should remove the taser from service and have it repaired immediately.

G.   Hobble leg restraint

1.   Officers will have the option of using the leg restraint device. In situations where a prisoner becomes violent during transport in a police vehicle or it's is believed that the prisoner will become violent in the rear of the transporting vehicle an officer will use the cloth leg restraint. These cloth leg restraints are also known as police Hobbles.

2.   Upon the prisoner becoming violent or unruly the transporting officer will notify dispatch of their situation and location. The transporting officer will notify dispatch of the nearest safe location where they can stop and dispatch will send a second unit to assist.

3.   Once stopped the officer will exit the vehicle and stand near the rear doors with the doors closed until the arrival of the second unit to prevent an escape.

4.   Upon arrival of the second unit the two officers together will remove the prisoner from the police vehicle by controlling the upper body. The officer will lay the prisoner face up outside the vehicle.

Dover Police Department

5. The officers will avoid standing near the prisoner's feet where they can be kicked. One officer will pin the prisoner's legs while the second officer applies the Hobble. Once applied the officers will place the prisoner back in the rear of the police vehicle. The prisoner will be placed up right and seat belted. At no time will a prisoner be placed face down.

6. Depending on the situation an officer may choose to place a spit mask on the prisoner on the prisoner to prevent the subject from spitting on officers.

7. Upon arrival at the police station the prisoner will be taken to the cell block using the Emergency Restraint Chair (ERC) in accordance with the policy if necessary.

H. The Department recognizes that certain extreme and exceptional circumstances may arise which may require the officer to employ equipment authorized in this section as a deadly weapon and its use may, in fact, result in serious physical injury and death to an opponent. These circumstances would be restricted to those requiring the use of deadly force and where it would not be practical or possible for the officer to use his handgun and/or other issued firearm.

I. PROHIBITED WEAPONS

The following weapons are strictly prohibited for use and/or carrying by officers of this Department:

1. Sap gloves

2. Brass knuckles

3. Slap-jacks

4. Mechanical Claws and other non-issue "come-along" devices

5. All other defensive weapons not issued or specifically authorized by this Department.

IV. DEADLY FORCE

A. Purpose

1. The purpose of this Section of this Order is to provide officers of the Dover Police Department with policy guidelines to follow regarding the use of deadly force generally, and firearms in particular, and establishing review procedures relating thereto.

2. This policy must be viewed as a guide for decision making before the fact and not as a standard for civil or criminal litigation judging the propriety of an action already taken which is a matter of established law as well as a process for prosecutors, courts, and juries reviewing the specific facts of a given incident.

A-047

DOV/00000035

Dover Police Department

3.   This Order may, however, provide basis for internal disciplinary action where violated.

B.   Philosophy

1.   The decision to employ deadly force against another human being is, in all probability, the most serious and difficult decision a law enforcement officer will be faced with.

2.   The primary responsibility of law enforcement is that of protecting life. This responsibility dictates the need for consideration of not only the legal aspects of the use of deadly force, but also the moral issues arising from the reverence for the value of life.

3.   It is, therefore, in the interest of both the public and the individual law enforcement officer that uniformly accepted guidelines clearly govern the use of deadly force, including firearms, in the enforcement of the law.

C.   Definitions

1.   "Deadly Force" - means force which the defendant uses with the purpose of causing or which he knows to create substantial risk of causing death or serious physical injury. Purposely firing a firearm in the direction of another person or at a vehicle in which another person is believed to be constitutes deadly force. A threat to cause death or serious bodily harm, by the production of a weapon or otherwise, so long as the defendant's purpose is limited to creating an apprehension that he will use deadly force, if necessary, does not constitute deadly force. See 11 Del.C. Section 471(d).

2.   "Serious Physical Injury" - means physical injury which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of health or prolonged loss or impairment of the function of any bodily organ. See 11 Del.C. Section 222(21).

D.   POLICY

1.   It is the policy of this Department that the use of deadly force, including firearms, may be employed only after all other reasonable means of apprehension have been exhausted, the police officer reasonably believes the force employed creates no substantial risk of injury to innocent persons, and the deadly force is employed as a means to:

a.   defend himself or another person from death or imminent danger of serious physical injury; or

b.   effect an arrest or prevent the escape from custody after an arrest for a felony involving the use or attempted use of deadly force when the officer reasonably believes that the person to be arrested or rearrested will cause death or serious physical injury if his apprehension is delayed. See 11 Del.C. Section 467.

A-048

DOV/00000036

Dover Police Department

2.  The firing of warning shots is considered outside of policy, except in extreme and extraordinary circumstances. The burden is upon the officer employing such warning shots to prove extreme and extraordinary circumstances.

3.  Discharging a firearm from a moving vehicle at a moving vehicle is considered outside of policy unless occupants of the other vehicle use deadly force against the officer by means other than the vehicle.

4.  It is the policy of this Department that only those officers meeting the minimum requirements for proficiency in the use of firearms as established by the Council on Police Training and this Department shall be allowed to carry firearms in the course of their employment. The firearms training must be successfully completed prior to carrying the firearm on or off duty.

5.  It is the policy of this Department that only Department issued weapons and ammunition be carried in the performance of duty.

6.  Officers carrying weapons off duty (personally owned or Department issued) are to refrain from the consumption of alcoholic beverages. In any event, no officer is to carry a weapon, either on duty or off duty, while impaired .

7.  In no case, however, shall an officer of this Department carry a weapon after having consumed any substance which presently impairs that officer's judgment.

8.  It is the policy of this Department that officers are not required to carry their weapon off duty, but may do so with special permission, in writing, from the Chief of Police. Additionally the following criteria must be met:

    a.  Completion of Field Training

    b.  The off duty weapon must be a semi-automatic pistol inspected and approved by the firearms officer.

    c.  The ammunition must comply with what is listed on the directive memorandum of authorized firearms and ammunition.

    d.  Successful completion of the Departments weapons qualifications course with the weapon to be carried.

    e.  Procedurally, an officer wishing to carry a weapon off duty shall obtain a statement from the (firearms unit officer) that requirements a through d, above, have been met. This statement shall accompany the permission request form which will be obtained from the Office of the Chief of Police and filed therewith upon completion.

A-049

DOV00000037

Dover Police Department

9.    Upon obtaining the requisite permission, officers are authorized to carry their Department issued service weapons or their personally owned, properly registered off duty weapons within the City Limits of Dover.  For guidance concerning carrying weapons  officers should refer to 11 Del.Code §§1441, 1442, including HR 218  and other applicable provisions of Delaware Law..

E.    Procedure

1.    Reporting of Firearms Discharge

a.    Whenever any officer discharges a firearm either on or off duty, whether accidentally or intentionally, and excepting authorized training, competition, or recreation purposes, a firearms discharge report (Appendix A hereto) shall be submitted to the Deputy Chief setting forth the circumstances of the incident.

The usual crime report will also be completed and submitted through the chain of command.

b.    In every case where an injury or death occurs, the incident will be investigated according to Section V of this Order.

c.    The unit commander, or in his absence the officer acting in his capacity, of the involved officer shall immediately be notified in all cases involving discharge of a firearm.

2.    Upon receipt of the reports required above, the Deputy Chief shall oversee the investigation and may appoint an officer to further investigate the incident to determine whether substantial evidence exists to support an allegation of violation of any Rules, Regulations, Orders, Procedures, or directives of this Department.  In addition, the investigator shall direct his inquiry toward the issues of proper police procedure and officer judgment in the incident.

3.    Upon completion of the investigation, the Deputy Chief shall submit his report and/or that of the appointed investigator to the Chief of Police.  This report shall include a conclusion as to whether substantial evidence exists to support an allegation of violation of any Rules, Regulations, General Orders, Procedures, or other directives of this Department, or any Law of the State of Delaware.  A copy of said report will be forwarded to the involved officer pursuant to 11 Del.C. Section 9200(C)(11).

4.    The Deputy Chief, or other investigator, if any, shall conduct his investigation in conformance with these Orders and 11 Del.C. Chapter 92.

5.    Upon receipt of the report of the Deputy Chief, the Chief of Police shall determine whether substantial evidence exists to support a complaint of misconduct.  If such evidence exists the Chief of Police shall:

DOV00000038

Dover Police Department

    (a)    refer the matter to the officer's unit commander for summary punishment; or

    (b)    refer the matter to the Professional Standards Board for a hearing.

6.    Upon completion of his review of the above report, the Chief of Police shall inform the involved officer of the results of the review in writing.

7.    Public Disclosure:  In every incident involving the discharging of a firearm by a police officer which results in death or injury to another person, the Chief of Police shall make public the findings of the investigation and the imposition of disciplinary action, if any.

F.    Other Prohibited Acts

Officers are prohibited from discharging their firearm in the following instances:

1.    When it appears likely an innocent person will be hit;

2.    At a motor vehicle and/or the occupants therein unless as a last resort, and the operator of the vehicle is directing the vehicle as deadly force against the officer or other innocent persons, except as set forth in Section IV D-3 of this notice, and the officer believes that employing deadly force creates no substantial risk of injury to innocent persons; and

3.    When the officer does not have a clear line of fire or a safe background.

G.    State Law Incorporated

The provisions of 11 Del.C. Sections 461-471 are incorporated herein by reference. Where other provisions of this ORDER are more restrictive on the use of force, deadly or otherwise, than State Law, the provisions of this Order shall prevail.

V.    PROCEDURE FOR INVESTIGATING USE OF DEADLY FORCE RESULTING IN PHYSICAL INJURY OR DEATH

A.    Notification

1.    Upon receipt of information that a police officer has been involved in the use of deadly force resulting in physical injury and/or death as either the principal or victim, the following persons will be notified immediately by Communications Center Personnel, in the following order:

    a.    Chief of Police

    b.    Deputy Chief

    c.    Operations Division Commander

    d.    Criminal Investigations Unit Commander

A-051

DOV00000039

**Dover Police Department**

      e.     Patrol Unit Commander

      f.     On call CI Detective

2.    All releases of information to the public concerning the incident will emanate directly from the Chief of Police or his designee. Any member of this Department who violates this provision will be considered to have committed a serious act of misconduct.

B.    <u>General Procedure and Duties of Units Involved in the Investigation</u>

    1.    Patrol Unit

        a.    A Section Leader or Platoon Leader will immediately respond to the scene and insure that sufficient personnel are present to perform the following functions:

            1)    At least one officer will remain with the body or injured person, report all pertinent data and secure any physical evidence available, until relieved by available CI Unit personnel.

            2)    At least one officer will protect the crime scene, secure all persons present, and prevent anyone from entering the area until relieved by CI Unit personnel.

            3)    At least one officer will remain with the officer involved to assure his personal safety and well being until relieved by CI Unit personnel. This officer will <u>NOT</u> initiate any discussion of the incident with the officer involved.

            4)    Ensure that a brief public safety statement is collected individually from the involved officer(s), covering only information necessary to focus the initial police response and direct the preliminary investigation. This includes information on:

                a.  Type of force used.

                b.  Direction and approximate number of shots fired by officers and suspects.

                c.  The number of suspects involved.

                d.  Location of injured persons.

                e.  Description of at large suspects and their direction of travel, the time elapsed since the suspects were last seen and any suspect weapons.

A-052

      f.   Description and location of any known victims or witnesses.

      g.   Description and location of any known evidence.

      h.   Any other information necessary to ensure officer and public safety and to assist in the apprehension of at large suspects.

      i.   See the Dover Police Department Public Safety Statement attached hereto as Appendix D.

b.   In cases where the deadly force used is an automobile, the Patrol Unit Commander will be notified and will assign a motor vehicle crash reconstruction expert to assist the Criminal Investigations Unit with the investigation.  He will report to the Deputy Chief or his designee.

2.   Criminal Investigations Unit

a.   The Deputy Chief or his designee will be in charge of the investigation and be responsible for its completion.  He will report the progress of the investigation via the normal chain of command. He will insure the following are complied with in the handling of the involved officers:

   (1)   That the involved officer(s) is afforded all Constitutional guarantees by the Criminal Investigations Unit Personnel

   (2)   That the personal safety and well being of the involved officer are guaranteed by the Criminal Investigations Unit Personnel

   (3)   That the weapon, gun belt, magazines and all ammunition of the involved officer is secured by the Criminal Investigations Unit Personnel

   (4)   That the involved officer is questioned without force or fear and without any promises or threats being made to him

   (5)   That the investigation will relate to matters of criminal law or violations of Departmental Policy

   (6)   That all provisions of 11 Del.C. Section 9200(C) are complied with

A-053

Dover Police Department

3.      Public Information Function.

        The Public Information officer will be responsible for disseminating information to the news media, but only after it had been approved by the Chief of Police or his designee.

4.      All personnel involved in any way in the investigation as delineated in Sub-sections 1 through 3 of this Section shall record all actions, conversations and interviews relevant to the investigation and shall prepare a report of same (supplemental) which shall be forwarded through the normal chain of command.

C.      Procedure for Relief From Duty Following the Use of Deadly Force Resulting in Physical Injury or Death

1.      When a Departmental Member uses deadly force which results in physical injury or death, they shall be immediately removed from duty by the Chief of Police or his designee and reassigned to administrative duties until completion of the internal investigation by the Dover Police Department.

2.      The Chief of Police or his designee will place the involved officer on administrative leave with pay if he feels it is warranted.

3.      An officer who is assigned to administrative duties including leave pursuant to this section shall be temporarily assigned to the Deputy Chief pending completion of the investigation.

4.      All officers who have used deadly force which has resulted in physical injury or death shall undergo psychological/psychiatric evaluation to determine fitness for duty prior to returning to full duty status.

D.      Procedure For Relief From Duty for Employees Involved in a Critical or Traumatic Incident or When Their Actions May have Contributed to the Death or Serious Physical Injury of a Person

1.      The Chief of Police shall consider the community's interest and the welfare of the employee in deciding when to place an employee on administrative leave and/or reassignment to administrative duties.   In all cases where the employee's actions, in an official capacity, may have resulted in death or serious physical injury, that employee shall be removed from line of duty assignment pending administrative review.

2.      The Chief of Police or his designee will place the involved employee on administrative leave with pay if he feels it is warranted.

3.      An employee who is assigned to administrative duties including leave pursuant to this section shall be temporarily assigned to the Deputy Chief pending completion of the investigation.

A-054

Dover Police Department

    4.  The Chief of Police, in consideration of all circumstances, may require the employee to undergo psychological/psychiatric evaluation to determine the fitness of the employee prior to returning to full duty status.

VI.    <u>REPORTING INCIDENTS INVOLVING USE OF FORCE OTHER THAN DEADLY FORCE</u>

    A.    Whether chemical agents, the Taser, or a blow is struck by an officer of this Department utilizing the baton, flashlight, fist, or other object; or whenever a prisoner or arrestee is injured as a result of police action, on or off duty, the officer shall immediately notify the on-duty supervisor.

    B.    In addition to the normal crime report, the officer using such force shall submit a Use of Force Report detailing the force used and the circumstances leading up to its use which shall be forwarded to the Deputy Chief via the chain of command. The condition of the subject, treatment and antidote administered, the identity of treating physicians and all other pertinent data, including the full identity of all witnesses, shall be included in said report. Photographs will be taken of all injuries to the subject and the officer. These photographs will be included with the Use of Force Report. The photographs will properly document any injuries to either party and help to protect the officer from claims of excessive force. Format for the Use of Force Report is attached hereto as Appendix B.

VII.    <u>USE OF FORCE REVIEW</u>

    A.    <u>Review</u>

        1.    All Use of Force Reports and Firearms Discharge Reports shall be submitted via chain of command to the Deputy Chief.

        2.    The Deputy Chief, who is charged with responsibility for the internal affairs function and ultimate responsibility for the inspections function, shall review all such reports to determine if the officer(s) complied or failed to comply with the Rules, Regulations, General Orders, Procedural Notices, Directives, policies and procedures of this Department. The Deputy Chief shall also review the applicable directives in light of the facts of each case.

        3.    The Deputy Chief shall report all findings to the Chief of Police, recommending therein the need for corrective action in regard to the officers and/or directives involved.

    B.    <u>File</u>

        1.    The Deputy Chief shall establish and maintain separate files for the Use of Force Reports and Firearms Discharge Reports.

        2.    The purpose of these files shall be to track and identify matters of use of force within the Department so as to identify training and equipment needs.

        3.    These files may also be used to identify those officers who may be developing tendencies for involvement in violent situations so that the causes may be identified and dealt with in the appropriate manner.

A-055

Dover Police Department

    4.    These files shall be considered <u>CONFIDENTIAL INTERNAL FILES</u> and shall not be open to public review without court order.  Firearms Discharge Reports shall remain permanently on file.

VIII.   <u>DISPLAY OF FIREARMS</u>

   A.    An officer shall never display firearms unnecessarily or draw them in any public place except for inspection or official use.

   B.    Members are specifically warned against "dry firing" of firearms at any place other than an approved range.

   C.    An off duty member and on duty members not in uniform will wear the firearm as inconspicuously as possible.

IX.   <u>HANDLING OF DEPARTMENTAL FIREARMS</u>

   A.    <u>Authorized Weapons</u>

Officers are only permitted to carry authorized firearms listed on the "Authorized Firearms and Ammunitions" Directive Memorandum while on duty with the exception of those issued by the Department or expressly authorized by the Chief of Police.  At no time shall an officer carry more than one issued side arm on duty without express authorization to do so.

   B.    <u>Inspections</u>

Firearms shall be inspected prior to the use, accepting and/or returning of same, for such things as obstructions in the barrel, shells in the firearm, or any apparent mechanical defect that would render the firearm unsafe.  All officers must conduct inspections of their issued firearms prior to deploying with same for duty.

   C.    <u>Loading</u>

Shotguns should be loaded and unloaded out of doors; not while in the police building or police vehicle.  The shotgun will be loaded with four rounds, all placed in the magazine.  No rounds shall be chambered unless imminent use of the firearm is expected. The slide action shall be kept forward.

   D.    <u>Other Shoulder Weapons</u>

    1.    All clip and magazine fed (including tub fed) shoulder weapons are to be loaded and unloaded out of doors, not in the police building.

    2.    Semi/full automatic weapons shall be carried and /or transported with the bolt closed, safety on, and the bolt dust cover closed, if so equipped.

    3.    Where weapons are mounted in car racks, such racks shall remain locked at all times weapon is not in actual use.

A-056

Dover Police Department

4.    No rounds shall be chambered unless imminent use of the firearm is expected.

5.    Shoulder weapons shall not be unnecessarily displayed to persons not members of this Department.

E.    <u>Safety</u>

All firearms shall be kept in "safe" trigger position until momentarily before intended discharge.

F.    <u>Rounds</u>

1.    Only Department issued rounds will be used in Department firearms.

2.    A rifle slug will only be loaded into the shotgun when the situation dictates its appropriateness or upon order of a supervisor.

X.    <u>CARE OF FIREARMS</u>

A.    Each officer will maintain his firearm in a high condition of cleanliness and readiness for use.

B.    No repairs or tampering with the mechanism of a Departmental firearm is authorized except by designated personnel.

C.    Any firearm which is in need of repair will be returned to the Range Officer.

D.    Firearms will be fully loaded while on duty except where provided by other directives (ie. Storing weapons within the designated evidence locker).

E.    Extreme care shall be exercised to secure the firearm while off duty to prevent it from being mishandled.

XI.    <u>TRAINING</u>

A.    <u>Firearms</u>

Officers are required to participate in scheduled firearms training programs, and must qualify at least once a year with each authorized firearm.

B.    <u>Deadly Force Policy</u>

All officers will be issued copies of and will be instructed in the policy on use of deadly force while at the police academy before being authorized to carry a firearm.

XII.    <u>REPORTING LOST OR STOLEN DEPARTMENTAL FIREARMS</u>

All lost or stolen Departmental Firearms must be reported immediately to the supervisor on duty. An incident report fully explaining the circumstances shall be submitted by the officer within eight (8) hours of knowledge of loss or theft.

A-057

Dover Police Department

XIII.   FIREARMS SAFETY

The safe handling, transporting and discharging the firearms shall be in accordance with the safety standard established by this Department. The following practices are considered extremely dangerous, unsafe, and strictly prohibited:

A.   Horseplay of any kind involving a firearm.

B.   The practice of quick draw unless the practice is part of an authorized training exercise at the range and under the supervision of the range officer.

C.   Pointing a firearm at an unarmed, handcuffed suspect.

D.   Drawing a firearm while exiting a vehicle. Officers should wait until they are out of vehicle and have solid footing before unholstering their firearms, unless an emergency situation exists and the circumstances dictate otherwise.

E.   The use of the service firearm and/or shotgun or other issued firearm as a defensive weapon or bludgeon, unless extreme or unusual circumstances dictate otherwise.

F.   All officers are to handle all firearms as if fully loaded at all times. This includes personally owned, departmental and confiscated/seized weapons.

G.   Negligent handling of any weapon which results in the accidental discharge of said weapon shall be considered a serious act of misconduct.

XIV.   SUPERSEDES

This order supersedes all orders written or otherwise, which are not in total conformity herewith.

XV.   EFFECTIVE DATE

This order shall become effective immediately upon execution and issuance.

ORDER EXECUTED and ISSUED this_____ day of August 2016.

_____
Paul M. Bernat
Chief of Police

A-058

Dover Police Department

# APPENDIX  A

A-059

Dover Police Department

# USE OF FORCE OPTIONS

Use of Force Options is a visual representation of force options available to the officer.  It is a fluid instrument which attempts to embody the dynamics of a confrontation.  The actions of the officer are dependent on the resistance level of the subject.



When possible, only department approved weapons and training techniques should be used. Other than the firearms, issued equipment is intended as less lethal force.  However, in certain situations, such weapons may be used in a deadly force incident.  During non-deadly force incidents members are to avoid striking the neck and head of suspects with any issued equipment, unless confronted with a deadly force situation.

The following are authorized pieces of equipment, restraints and techniques:

**1. Presence and Verbal Communication (Levels 1 & 2)**
Officers should, whenever possible, use verbal skills to attempt to control subjects before resorting to physical control methods.

**2. Defense Tactics (Levels 3,5 & 6)**
Officers should only use tactics appropriate to the situation and that have been taught by department defensive tactics instructors.

A-060

**3.  Aerosol Spray (Level 3)**
Pepper Spray may be used when a person displays the intent to engage in active, aggressive or aggravated resistance.  Pepper spray may be used on vicious or aggressive animals when those animals interfere with the safety of the officers or citizens.

**4.  ASP (collapsible baton), Flashlights, or Riot Baton (Levels 3, 5 & 6)**
Batons are designed for blocking, jabbing, striking, or to apply control holds.  Flashlights are not intended to be used as a weapon or as a replacement for the baton, but there may be exceptional situations where it may be necessary to use the flashlight as a defensive instrument.

**5.  Handcuffs, Flex cuffs, or other Restraint Devices (Level 3)**
In an attempt to minimize the risk of personal injury to officers and others during arrest situations, all officers should handcuff, as soon as possible, all persons arrested.

**6.  Less Lethal Shotguns (Level 5 & 6)**
Less Lethal shotguns may be used against persons who are armed with a weapon, excluding firearms, that could cause substantial injury or death to themselves or others or when a subject poses a significant threat to the safety of the officer or other persons.  This includes, but is not limited to: an edged weapon, club, pipe, bottle, brick, etc.

Two officers are required to be present when a less lethal shotgun is deployed.  It may be used as an option to deadly force, only when circumstances allow the officers involved to bring an incident to a safe conclusion without unnecessary risk to the officers.

**7.  Chemical Agents (Level 4)**
Chemical agents will only be used under the direction of the On Scene Commander, and only then by officers assigned to the Special Operations Response Team.

**8.  Specialized Methods (Level 1,3 & 5)**
K-9 (bites and injuries) and pyrotechnic devices; Only those members assigned to units receiving specialized training in these tactics or tools are authorized to use them, and any other tool or technique not listed in which they have been trained and have been approved.  Training and use of such methods are under the control of those specialized units.

**9.  Taser (Level 3)**
The Taser is categorized as a less lethal force and may be used to protect the officer from bodily harm when making an arrest or apprehension and to control a dangerous or violent subject when lethal force does not appear to be justified.

A-061

Dover Police Department

# APPENDIX B

A-062

Dover Police Department

DOVER POLICE DEPARTMENT

FIREARMS DISCHARGE REPORT

TO:      _____
         DEPUTY CHIEF

FROM:    _____
         (Reporting Officer)

         _____
         (Unit Designation)

THROUGH: _____
         (Platoon/Section Leader)

         _____
         (Unit Commander)

         _____
         (Division Commander)

DATED:   _____

I.    BASIC DATA

CR#_____ DATE & TIME OF INCIDENT

ACCIDENTAL: Yes [] No [] INTENTIONAL: Yes [] No [] ROUNDS FIRED:_____

INJURY/DAMAGE TO:   Human []   Animal []   Property []

WAS INJURY FATAL:   Yes []   No []

II.    WEAPON(S) USED:   (Describe weapon giving make, model & serial # & barrel length)

III.   ROUND(S) EXPENDED:   (For each round expended state caliber, configuration, placement of round, observed effect of round)

AUG 2016                          25

A-063

Dover Police Department

IV.     IF OPPONENT WAS ARMED, DESCRIBE WEAPON USED BY DEFENDANT.

V.      NAME ALL PERSONS INJURED & DESCRIBE INJURIES.

VI.     DESCRIBE ALL INJURIES SUSTAINED BY YOU OR OTHER POLICE PERSONNEL PRESENT.

VII.    IF DAMAGE/INJURY WAS TO ANIMAL(S) OR PROPERTY, GIVE NAME(S) ADDRESS(ES) OF OWNER(S) AND DESCRIBE EXTENT AND TYPE OF INJURY/DAMAGE (ESTIMATE VALUE).

VIII.   IF ACCIDENTAL DISCHARGE, GIVE RECOMMENDATIONS FOR IMPROVING TRAINING, EQUIPMENT AND/OR PROCEDURES SO AS TO AVOID FUTURE INCIDENTS.

IX.     GIVE NAMES, ADDRESSES AND/OR DESCRIPTIONS OF ALL WITNESSES OR PERSONS PRESENT.

X.      NARRATIVE DESCRIPTION OF INCIDENT (attach additional sheets as needed)

XI.     CERTIFICATION

        I, the undersigned, hereby certify that the information contained within this report is true and correct.

                        Officer's Signature

A-064

Dover Police Department

# APPENDIX C

A-065

Dover Police Department

DOVER POLICE DEPARTMENT

<u>USE OF FORCE REPORT</u>

TO:      DEPUTY CHIEF OF POLICE

FROM:   _____ , _____
            (Reporting Officer)        (Unit Designation)

THROUGH:  _____
            (Platoon/Section Leader)

            _____
            (Unit Commander)

            _____
            (Division Commander)

DATED:     _____

I.    <u>BASIC DATA</u>

CR#_____DATE & TIME OF INCIDENT_____

DEFENDANT'S NAME:_____AGE:\_\_\_\_RACE\_\_\_\_SEX\_\_\_\_
DEFENDANT'S D.O.B. _____

II.   <u>NARRATIVE DESCRIPTION OF INCIDENT</u> (Attach additional sheets if needed)

III.  <u>WEAPON(S) USED BY OFFICER</u> (Describe - includes fists, etc.)

IV.  <u>WEAPON(S) USED BY DEFENDANT</u> (Describe - includes fists, etc.)

V.   <u>DESCRIBE RESISTANCE BY DEFENDANT</u>

AUG 2016                28

A-066

**Dover Police Department**

VI.    <u>DESCRIBE FORCE USED BY OFFICER</u>

VII.    <u>DESCRIBE INJURY & TREATMENT - DEFENDANT</u>

VIII.    <u>DESCRIBE INJURY & TREATMENT - OFFICER(S)</u>

IX.    <u>COMMENTS</u> (Continuation of above)

X.    <u>DESCRIBE DAMAGE TO CITY PROPERTY</u> (Uniform, etc.)

XI.    <u>IDENTIFY ALL WITNESSES AND PERSONS PRESENT</u>

XII.    <u>CERTIFICATION</u>

I, the undersigned, hereby certify that the information contained within this report is true and correct.

(Officer's Signature)

AUG 2016        29

A-067

# APPENDIX D

Dover Police Department

# PUBLIC SAFETY STATEMENT

**"Officer, I am ordering you to give me a Public Safety Statement. Due to the immediate need to take action, you do not have the right to wait for representation to answer these limited questions."**

- Were you involved in an officer-involved shooting?

- Approximately how many rounds did you fire and in what direction did you fire them?

- Do you know if any other officers fired any rounds?

- Is it possible the suspect fired rounds at you?

- Is anyone injured?   If so, where are they located?

- Are you aware of any witnesses? If so, what is their location?

- Approximately where were you when you fired the rounds?

- Are there any outstanding suspects?  If so, what is the description, direction, and mode of travel?

- How long have they been gone? What crime(s) are they wanted for?  What weapons are they armed with?

- Are there any weapons or evidence that need to be secured/protected? Where are they located?

Additionally, supervisors should obtain the public safety statements of all substantially involved personnel *before* they are transported from the scene. The supervisor, absent exigent circumstances, *shall remain* at the scene to provide the Public Safety Statement to responding investigators.  The information shall be provided, either voluntarily or with representation, to the investigators upon their request.

These questions should be followed by an order *not to discuss the incident with anyone*, prior to the arrival of the assigned Investigators, with the exception of legal representatives.

A-069

**R. PAUL McCAULEY, Ph.D., FACFE**
*Criminologist*
4620 Lucerne Road
Indiana, Pennsylvania 15701

Telephone:
724-349-9676
Fax:
724-349-6477

May 15, 2017


Brian S. Chacker, Esq.
Gay Chacker & Mittin
1731 Spring Garden Street
Philadelphia, PA 19130-3915

> RE:   Stephen DiFlorio v. City of Dover, et al.
>       In the United States District Court for the District
>       of Delaware
>       C. A. No.:1:15-cv-00186-GMS

Dear Mr. Chacker:

Please accept this letter as my report for the above-referenced
case.  I reserve the right to amend this report should
additional information become available.

## I.   QUALIFICATIONS

I have been an independent consulting criminologist for more
than thirty years and continue in that capacity, engaged in
criminal justice policy and operational research, including
police/law enforcement.   My recent work includes providing
written testimony to the *President's 21st Century Policing Task
Force* and participating at the Police Executive Research Forum
(PERF)conference (Washington, DC) on *Re-Engineering Police Use
of Force Training.*

I am Professor Emeritus of Criminology and former Chairperson of
the Department of Criminology, Indiana University of
Pennsylvania (IUP).   The University is a comprehensive, doctoral
degree granting institution with an approximate enrollment of
13,000 students.   The Department of Criminology offers
bachelors, masters, and doctorate degrees and has about 1,000
criminology majors.   I taught and conducted research at all
academic/degree levels.

I am a former Pennsylvania municipal police officer and trainer
and in that capacity I engaged in and taught the investigation,
arrest, handcuffing, transportation and processing of

individuals.   Additionally, I was an NRA certified firearms instructor.  Also, I am a British Home Office Police Detective Course trained and graduate (Scotland Yard/Police College).  My police detective training and general police training and academic preparation include police operations, interviewing, identification by photo array and line-ups, and major crime investigation management.  For more than twenty-five of my 30 plus year career, I have been a state certified police instructor in Pennsylvania, Kentucky, and Florida.  In my academic duties, as well as in my police training duties, I teach the policies and procedures of police operations, including the use of force.  Also, I have written or published more than 80 professional papers, books, chapters, and technical reports, many of which address the issues concerning police administration, operations, and policies.

For almost ten years I was a member of the faculty of the Southern Police Institute, School of Police Administration, University of Louisville.  In that position I lectured to more than 1,500 police commanders from across the United States, including command officers of the Delaware State Police, in the area of police management and operational policy formulation, which included criminal investigations, internal affairs, inspection, and police accountability.  More than 300 of these student officers have become police chiefs.  Also, I have received numerous letters and commendations from police executives for my work and contributions to their agencies.

In 1987, I was a Fulbright Scholar, Australia, lecturing to university faculties of law, justice studies, business, and police commanders, and security directors.  My lecture area was the relationship/interaction between public police and private security in the prevention of crime.

I hold the designation Fellow American College of Forensic Examiners and have been qualified as a police expert in state and federal courts in more than 30 states including Delaware. In 1984, I was one of two finalists interviewed for the position of Commissioner of the Pennsylvania State Police.  The Pennsylvania State House of Representatives issued a formal citation recognizing my career and contributions to law enforcement.

Additional information is provided in my curriculum vitae, which is enclosed.  Also, enclosed is a list of cases in which I have offered testimony during the past four years.

## II.   INTRODUCTION

I was retained by Gay Chacker & Mittin to review the case material and render a professional opinion regarding the police operations and practices, at approximately 10:30 p.m., on or about Saturday, March 16, 2013, Sunday, March 17, 2013, and Monday, March 18, 2013 involving the above-referenced parties. My retainer/minimum of $3,500.00, to which I bill at an hourly rate of $350.00, was paid in advance of my rendering any analysis or opinion and payment was not contingent upon my rendering a favorable opinion.

## III.   METHODOLOGY

My examination and analysis of this matter are based on generally accepted qualitative methodologies commonly used in the social sciences.  These techniques include comparative analysis, ethnography/description, content analysis, and case study in assessing compliance with and deviations from accepted operational and managerial practices.

This report is being offered as an expert forensic report for the purpose of this litigation.  However, it is intended to be critical, constructive, instructional, and useful should anyone from the Dover Police Department (DPD) read it.  It is based on the best practices of police/law enforcement management, organization, administration, and operations and the information provided in the following listed materials.

## IV.   MATERIALS REVIEWED

In the preparation of this report I have reviewed the following materials, which are commonly examined in my profession and discipline in rendering professional/expert opinions:

1.    Plaintiff's Amended Complaint in this matter;
2.    Defendants' Answer to Amended Complaint with Separate Defenses;
3.    Defendants' Responses to Plaintiff's Discovery Request with Attachments;
4.    Defendants' Use of Force and Firearms Policy;
5.    Kent County EMS Report;
6.    Bayhealth Medical Center Emergency Department Records;
7.    Deposition Transcript of Stephen DiFlorio;
8.    Deposition Transcript of Robert Z. Barrett;
9.    Deposition Transcript of Brian Berns with Exhibits;
10.   Deposition Transcript of Brian Wood;

4

11.  Deposition Transcript of Mark Hoffman;
12.  Deposition Transcript of Jeffrey Melvin.

## V.   SUMMARY OF FACTS

Although numerous facts are in dispute, the police reports
indicate generally, that on Saturday, March 16, 2013 at
approximately 10:42 p.m. DPD officers responded to Smithers at
140 South State Street for a reported fight.  Officers were
directed by a patron or bouncer to an alley on the side of
Smithers where they came upon a 20 year old White male, latter
to be identified as Stephen DiFlorio, with blood on his hands
and face, without a shirt, and putting on his shoes.  The
officers' identity announcement, warning and instructions to
DiFlorio, his compliance and response, and the officers' degree
of force used are in dispute.  Nevertheless, PO Berns gave
DiFlorio commands to "come here" and DiFlorio did not comply.
MCPL Melvin walked past PO Berns and grabbed/hugged DiFlorio
around the waist.  During this physical encounter PO Berns
tasered DiFlorio in the back for a five (5) second cycle causing
him to fall striking his head on the concrete and as a result he
was unconscious for approximately five (5) minutes.  PO Berns,
MCPL Melvin, CPL Hoffman, and PFC Wood were present.  He was
transported to a hospital by ambulance.  He was treated and
later discharged.  No DPD officer left any written documents
with DiFlorio or with the hospital indicating he was being cited
and/or what if anything DiFlorio was to do or not do upon being
discharged/released.

At approximately 8:00 p.m., Sunday, March 17, 2013 officers were
informed that DiFlorio was released from the hospital.  PO Berns
obtained a warrant for DiFlorio for disorderly conduct,
resisting arrest, and underage consumption.  At Approximately
10:12 p.m. PO Berns and MCPL Melvin went to DiFlorio's residence
to serve the arrest warrant.  The officers' announcement, use of
force, and DiFlorio's compliance, resistance, and response are
disputed.  The officers were able to handcuff and transport
DiFlorio to the DPD for processing.  On Monday, March 18, 2013
DiFlorio was transported for arraignment and then to Department
of Corrections by PO Berns.

The facts presented in DiFlorio's Citizen Complaint to the DPD
indicate on March 16, 2013 while in the alley he did not know
the police had arrived and no officer spoke to him before he was
tasered in the spine/back as he was walking away.  On March 17,
2013 the police came to his home to serve an arrest warrant.
The officers knocked on both the front and back doors.  When

DiFlorio opened the door two officers grabbed each of his
shoulders and threw him down the stairs onto the ground where
five to seven officers punched, kicked and beat him all over his
body—face, head, back, legs, and arms while he was on the ground
with his hands behind his back.  He was hit so hard he "pooped"
himself.  He was bleeding from his nose, head, arms, back, face,
elbow, knee, and shoulder.  He was taken to the DPD garage where
he was thrown out of the police car and a gold chain he was
wearing was ripped off and not seen since.  He was then taken to
a holding cell.  He was taken before a judge and bail was set.
His injuries include a concussions on the 16th and 17th, two black
eyes, bloody nose, lumps on his head, bloody elbow, shoulder,
and knee, sprained/torn finger, and a gash in his back.

Additionally, both MCPL Melvin and PO Berns testified that
DiFlorio did not comply with PO Berns' order to come to him, he
was walking away, unarmed, not violent, and not verbally or
physically threatening when MCPL Melvin grabbed DiFlorio.  At
the time PO Berns deployed the Taser, it appeared to PO Berns
that DiFlorio was about to turn and punch MCPL Melvin.  Prior to
MCPL Melvin walking past PO Berns to approach and engage
DiFlorio in a "hug" from behind, the two officers did not speak
to one another to formulate a plan.  Later, DiFlorio pled guilty
to Disorderly Conduct and all other charges were dismissed.

All IAI findings for the involved officers' Use of Force and/or
Misconduct/Violating Department Rules & Regulations were **Not
Sustained** .

The DPD reported to the FBI *Uniform Crime Report* the DPD had 93
sworn officers in 2013.

Note: TASER™ is a registered trademark of TASER International.
In April 2017, Taser International became Axon Enterprise which
is one of several manufactures of Conducted Energy Weapon
(C.E.W.) further described as an Electro-Muscular Disruptor
(E.M.D.) and Electronic Control Weapon (ECW).  For the purpose
of this report I shall use the term TASER since it is the device
used by the DPD.

## VI.  ANALYSIS AND DISCUSSION

Although it is not my role to decide issues of credibility,
generally accepted social science technique requires that I
comment on apparent inconsistencies, assertions of interested
witnesses which are contrary to logic or other facts.  Further,
while I do not resolve credibility issues, I have offered

6. Whether the action takes place in the context of effecting
   an arrest
7. The possibility that the suspect may be armed
8. The number of persons with whom the police officers must
   contend at one time.

Courts applying this test must pay "careful attention to the
facts and circumstances of each particular case, including the
severity of the crime at issue, whether the suspect poses an
immediate threat to the safety of the officers or others, and
whether he is actively resisting arrest or attempting to evade
arrest by flight." This judgment is made "from the perspective
of the reasonable officer on the scene rather than with the
20/20 vision of hindsight."

**Dover Police Department (DPD) Use of Force General
Orders/Policies**

Generally for police officers to acquire police certification,
all municipal police officers are to be trained in the use of
force.  This training must be consistent with police department
policies and procedures, which in turn must be consistent with
established statuary and constitutional laws.

To assist officers to understand the levels of force that may be
used under varying degrees of resistance by a suspect, some
version of a use of force continuum is commonly used in police
training.  Law enforcement officers are permitted to use the
degree of force that is reasonably necessary to accomplish their
lawful objectives, and to overcome any unlawful resistance.

DPD General Order 1.3 *Use of Force and Firearms Policy* provides
Use of Force Options that I have summarized as follows:

1.   Presence
2.   Verbal Commands
3.   Restraint Control
4.   Chemical Agents
5.   Temporary Incapacitation
6.   Deadly Force

III. FORCE OTHER THAN DEADLY FORCE

   F.   Electronic Control Devices

      8.   The Taser may be deployed to safely effect the
           arrest of a noncompliant individual, or an

Further, the officers did not know if DiFlorio was a victim or a
perpetrator.  However, the mere **PHYSICAL PRESENCE** of Berns and
Melvin does not mean **POLICE PRESENCE** if DiFlorio did not see
them and recognize them as police officers.  Although the police
uniform provides visual identification, when the situation is
such that subjects cannot visibly identify the officer's uniform
additional verbal identification "POLICE" is required.  Without
doing so any police verbal commands are meaningless.  If
DiFlorio did not know the person (Berns) who was telling him to
"come here/come to me" was a police officer he was not required
to comply and may walk away.

**Opinion**:  The failure of the officers to identify themselves was
contrary to accepted police practices and DPD directives.

## C.    Tactical Plan, Approach, and Communications

Modern police training includes the evaluation, planning, and
management of police response to violent and non-violent field
situations, and the use of tactics that minimize the danger of
risks to themselves, the actors, and to others/public.  Officers
understand how to contain a scene, isolate suspects, and
establish perimeters.  They are trained to quickly develop a
plan, as practicable, by gathering available information,
assessing risk factors/threat assessment, communicating with
other officers and superiors, and gathering additional
resources.  Further, reasonably trained and competent officers
know the value of cover, concealment, and distance strategies to
optimize the time they can make available to calm, de-escalate,
and negotiate with the actors.

Likewise, supervisors and commanders debrief officers regarding
tactical situations and related communications, equipment, and
weapons available and used/deployed during the operation.  These
debriefings provide important information for assessing officer
performance.  This is especially important, because when
officers perform poorly-recklessly officers and citizens may be
seriously or fatally injured.

Prior to MCPL Melvin walking past PO Berns to physically stop
and engage DiFlorio with a waist hug from behind, the two
officers did not speak to one another to quickly develop a plan,
such as a two-on-one pedestrian stop (two officers on one
subject).  Such a stop would include first establishing officer
identification/**Presence** and then issues **Verbal Commands**,
consistent with DPD directives.  MCPL Melvin testified he had
the space to communicate with DiFlorio without getting close to

10

him.  Communication is central to preventing the escalation of
tensions and the use of force.

**Opinion**:  Even accepting DiFlorio knew the officers to be police
and walked away in non-compliance with the officers' verbal
commands, MCPL Melvin's use of physical **Restraint Control** on
DiFlorio without using reasonable verbal commands/Verbal Judo/
communications to gain compliance from an unarmed, non-violent,
non-threatening person, who was merely walking away, escalated a
passive situation into an unnecessary physically active
situation.  Such police conduct is contrary to accepted police
practices.

## D.    The Use of the Taser

MCPL Melvin's physical engagement with DiFlorio who was unarmed
and standing, with MCPL Melvin's standing behind him with his
arms hugging DiFlorio's waist was not a split-second force
decision requiring PO Berns' deployment of a Taser.   PO Berns
did not attempt to assist MCPL Melvin in two-on-one physical
**Restraint Control** techniques but rather yelled "watch out" and
deployed his Taser striking DiFlorio in the back and almost hit
MCPL Melvin with a Taser probe causing MCPL Melvin to let go of
DiFlorio causing DiFlorio to fall backward striking his head on
a concrete surface, resulting in unconsciousness.  MCPL Melvin
testified that the next day he instructed his shift officers not
to Taser anyone when two officers are engaged with one subject.

PO Berns failed to give MCPL Melvin a proper warning by
announcing "TASER, TASER" so he could separate himself/stand
back and away from DiFlorio to giving Berns a clear Taser target
and not jeopardizing MCPL Melvin to possible Taser exposure.
Additionally, the Taser warning gives DiFlorio an opportunity to
comply with the officer's instructions.

The Police Executive Research Forum (PERF):  Community Oriented
Policing Services (COPS) U.S. Department of Justice.  2011
*Electronic Control Weapon* (ECW) *Guidelines*, March 2011, state in
part:

    **Using the ECW;**

    25.  ECWs should be used only against subjects who are
        exhibiting active aggression or who are actively
        resisting in a manner that, in the officer's judgment,
        is likely to result in injuries to themselves or

others.  ECWs should not be used against a passive
subject.

26.   Fleeing should not be the sole justification for using
an ECW against a subject.  Personnel should consider
the severity of the offense, the subject's threat
level to others, and the risk of serious injury to the
subject before deciding to use the ECW on a
fleeing subject.

Note:   PERF is a primary research organization of the
nation's police executives and major city police
chiefs.

PO Berns and MCPL Melvin were justified to engage in a foot
pursuit or follow DiFlorio as he walked away from them.
DiFlorio was merely walking away and non-compliant to PO Berns'
orders.  Again, DiFlorio was not armed, not violent, or
threatening and he was not acting in a manner that is likely to
result in injuries to himself or others.  Also, at that moment
it was unknown if DiFlorio was a victim or a perpetrator meaning
the officers did not know whether he committed any crime.
Clearly, he was not aggressive and non-compliant to police
orders.

Also, Alpert, et al. (2011) states in part;

CEDs [Tasers are CEDs] are rapidly overtaking other force
alternatives.  Although the injury findings suggest that
substituting CEDs for physical control may be useful, their
ease of use and popularity among officers raise the specter
of overuse.

The possible overuse of CEDs has several dimensions.  CEDs
can be used inappropriately at low levels of suspect
resistance.  Law enforcement executives can manage this
problem with policies, training, monitoring and
accountability systems that provide clear guidance (and
consequences) to officers regarding when and under what
circumstances CEDs should be used, or when they should not
be used.  U.S. Department of Justice, National Institute of
Justice *Police Use of Force, Tasers and Other Less-Lethal
Weapons,* p.15.

PO Berns testified that he had deployed his Taser earlier on
that same day/shift.  This raises concern of Taser over use.

12

I was retained as plaintiff's expert in the matter of Lateef
Dickerson v. Cpl. Thomas W. Webster, et al. [Dover Police
Department], in the United States District Court for the
District of Delaware C. A. No.: 14-1244-RGA.  That incident
involved PFC Webster using excessive force/deadly force by
allegedly kicking Dickerson in the head with a hard shoe.
Nevertheless, I examined the 36 Use of Force reports generated
by Thomas Webster with reviews from 2006 to 2013 which are
summarized as follows:

| | | |
|---|---|---|
| Taser | 26 | |
| Hand/fist } | | |
| Take-down } | 8 | |
| Pepper spray/OC | 1 | |
| Firearm Discharge | 2 | (dogs) |
| Baton/ASP | 1 | |
| | 38 | (variation due to reports indicating more than one type of force used) |

Using an incident-based analysis each individual report is
not remarkable.  However using a global or aggregate
analysis of all of PO Webster's use of force reports, a
pattern of improper Taser use is present.  He approaches
citizens/suspects for minor offenses and when they run/do
not comply he deploys his Taser.

Clearly, the DPD has not identified Pfc Webster's
misconduct which sends a clear message that such deviant
behavior is acceptable.

MCPL Melvin's unreasonable fear of being shocked by PO Bern's
Taser deployment resulted in MCPL Melvin dropping DiFlorio.
Taser International (TI) Training Bulletin 12.0-04, dated June
28, 2005 states:

TI training has long encouraged that device operators
consider the TASER system application as a "5-second window
of opportunity," during which time an arrest team can begin
restraint procedure.  However, it has come to our attention
that there may be a training issue where arrest teams are
avoiding touching the subject during TASER device
application.

1.   It is important to emphasize that arrest teams can
handle the subject during TASER system application.
Failure to begin restraint procedures during a TASER
device application can unnecessarily prolong the

13

duration of TASER device applications administered to a given subject.

5.    If circumstances preclude restraint procedures during TASER system application, such as a single officer acting alone:

a.    The user should attempt to minimize the uninterrupted duration and total number of TASER device applications.

b.    If the subject refuses to comply after multiple TASER device applications, the operator should consider whether additional applications are making sufficient progress toward compliance/ restraint OR if transition to a different force option is warranted. (p. 1)

When PO Berns deployed his Taser, MCPL Melvin released his "waist hug" on DiFlorio allowing DiFlorio to fall and strike his head on the concrete.  MCPL Melvin should have known that if he was not struck with a Taser probe, he was not subject to being shocked by the Taser and should not have released DiFlorio.  He should have attempted to maintain control and safely guided DiFlorio to the ground if DiFlorio resisted.

Clearly, in the instant matter two officers were present and verbal communications from a safe distance were available to avoid escalation of the use of force.  If DiFlorio did not comply with verbal communications defensive two-man tactics should have been used rather than deploying the Taser.  Under these circumstances the officers, under the supervision of MCPL Melvin had an opportunity and obligation not to escalate the situation.  At this point the officers' continuing objective was to gain DiFlorio's compliance through verbal communications and then through two-on-one physical Restraint Control compliance.

Nevertheless, an officer removed the Taser probes from DiFlorio's back and he was transported to hospital, consistent with DPD directives.

**Opinion**:  PO Berns and MCPL Melvin's actions and/or inaction unnecessarily created a split-second force situation contrary to DPD directives and accepted police practices.

14

**Opinion**: Considering the totality of the circumstances, the deployment of the Taser against DiFlorio was unnecessary, unreasonable, and excessive force.

**Opinion**: MCPL Melvin's lack of Taser training and knowledge caused him to drop DiFlorio rather than guide him to the ground during the Taser application.

**E.     Photographs and Hospital Written Police Instructions**

DiFlorio was taken to the hospital and at no time either at the hospital or at the fight scene were photographs taken of DiFlorio's injuries, if sustained by police use of force, as required by DPD directives.  Although he was Tasered and as a result struck his head, no photos were taken.

**Opinion**:  The failure to photograph injuries resulting fro the police use of force was contrary to accepted police practices and DPD directives.

It is generally accepted police practice when a person (DiFlorio) who is being treated in an Emergency Room (ER) as a result of a police action and that person will be arrested or charged by the police, a police officer will either remain with the person, or the person is issued a written citation with the necessary instructions.  Commonly, those police documents then are placed in the patient's hospital property file or discharge file which is given to the patient by hospital staff upon discharge from the ER.

In the instant matter, DiFlorio was unconscious for a period of time and his mental state/memory capacity unknown.  It was unreasonable for PO Hoffman to tell DiFlorio at the hospital to turn himself in to the DPD the next day/tomorrow or an arrest warrant will be issued for him and expect him to remember the details.

**Opinion**:  A reasonably trained and competent police officer would issue a written citation or other appropriate document to DiFlorio recognizing the high likelihood that DiFlorio would not remember detailed verbal instructions given to him in the ER.

**Opinion**:  The failure to provide DiFlorio with a citation or written instructions created an unnecessary situation that resulted in the issuance of a arrest warrant and additional police use of force.

A-081

15

**F.    Police Executuion of Arrest Warrant on March 17, 2013**

Accepting the arrest warrant was valid, PO Berns and MCPL Melvin
were correct to serve the arrest warrant for DiFlorio at the
described location/address.  Although DiFlorio did not comply
immediately with the officers' commands to open the door,
eventually he did open the door.  Again, the use of force
continuum is applicable.  When DiFlorio opened the door to his
residence he knew the men that were present outside were police
officers.  When DiFlorio identified himself to the officers at
the door, the officers had no reason to believe DiFlorio was
armed or a threat and should have used Verbal Commands/
communication and directed DiFlorio to exit the house, that he
was under arrest, and shown DiFlorio the Arrest Warrant.  This
was not done.  Rather, when DiFlorio opened the door and
identified himself, DiFlorio was not asked to step outside and
PO Berns and MCPL Melvin grabbed him by his shoulders and pulled
him outside.  In the process of pulling DiFlorio outside both
officers and DiFlorio fell down the steps, landing on the grass.
While on the grass multiple officers used force to restrain
DiFlorio.  The officers' level of force used and the level of
resistance presented by DiFlorio are disputed.  However, it is
clear that DiFlorio was on the ground/grass yelling for help.
Again, no photographs were taken of DiFlorio's injuries.

**Opinion:**  Any physical force used against DiFlorio, including
punching and kicking, that is not necessary to gain physical
control is excessive force.

**Opinion:**  Any physical force used against DiFlorio, including
punching and kicking, after he was controlled/restrained/
handcuffed is excessive force.

**Opinion:**  Any impacts/strikes to the neck or head with any
object or weapon, including hard shoe kicks are permitted only
when deadly force is permitted.

**G.    Internal Affairs Investigation (IAI), Supervision, and
Training**

Note:  In the DPD Internal Affairs Investigations (IAI) are
conducted by the Internal Affairs Unit (IAU)

It is important to understand that a primary purpose of
completed internal affairs investigations is to identify
problems and issues about written directives, policies,
supervision, and training.  Completed internal investigations

provide a foundation for feedback to the policy maker so
appropriate corrective actions (enhanced policies, procedures,
supervision, and training) can be developed, implemented, and
evaluated.

The International Association of Chiefs of Police (IACP)
Training Key #299 The Disciplinary Process:  Internal Affairs
Role, Vol. XIII, (1980), p. 61 states,

> Perhaps the most exacting aspect of the police
> discipline process is the investigation of an
> allegation of misconduct....  The investigation
> must be seen by both the community and the police
> as being impartial and diligent....
>
> Confidence and trust in police integrity can be instilled
> in the public only through objective investigations....  A
> stable, uniform, and totally unimpeachable system of
> investigating complaints against any of the department's
> employees reinforces proper police conduct as well as
> assures the public of effective and honest police services.

Just as police officers must consider the totality of the
circumstances when assessing the need to use force, police post
incident investigations also must consider and analyze the
totality of the circumstance.  The failure of the DPD to include
in its IAI of this matter, the issues of officers'
identification, tactics, de-escalation, verbal judo, and cover-
distance, and the other issues as discussed in this report, when
confronting a suspect under these circumstances, reflect a bias
and a deliberate indifference to the safety and well-being of
officers and citizens alike.

These failures did not allow the DPD to assess the need for
policy and training changes or discipline.  The IAI simply
determined the complaint of excessive force was NOT SUSTAINED.
From the materials I have reviewed, the DPD has fallen below the
accepted practices of police internal investigatory and
administrative conduct.  These failures have jeopardized officer
accountability and DPD transparency and public trust.

Also, the DPD practice of requiring DiFlorio, complainants
generally, to submit a sworn written statement/complaint under
the following penalty is intimidating and biased in favor of the
officers.  The Citizen Complaint Form states in part:

MEMORANDUM OF UNDERSTANDING

I further understand that any person who knowingly reports false information to the police is subject to arrest and prosecution.

This is especially troublesome when officers responded to DiFlorio's complaint with an unsworn signed statement and/or interview. Both parties, complainant and officer(s) must be sworn and held to the same standards. This is a foundation for police accountability, transparency, and community trust.

DPD General Order 52 Internal Affairs states in part;

I.   Purpose

    A.   The purpose of the Dover Police Department Internal Affairs Unit is to maintain integrity, ensure professional conduct and create a positive image of the Department. The goal the unit is to assist in ensuring the integrity of the Department, by maintaining an internal system which is objective, fair, and equitable in its methods of internal investigations.

II.  Procedure

    A.   The objective of the Internal Affairs Unit must be to find the truth. This benefits the Department, the officers and employees, and most importantly, the Citizens of Dover.

In order to find the truth, IAIs are to be comprehensive thus requiring a review all evidence. The IAI failed to address relevant aspects of police policies and training. A function of an IAI is to determine if the officer's actions were consistent with department policies and training. When training deficiencies are discovered it is common practice to IAI to send its finding to the training unit where training adjustment and enhancements will be made. In the instant matter, as examples,

- Officer presence by verbal identification and/or uniform
- The officers did not use distance and time (Officer tactical approach) to communicate effectively with DiFlorio before escalating the level of force on both March 16 and 17, 2013

- The officers did not act as a supervised two man team with a plan
- PO Berns did not give a Taser warning when he had ample time to do so
- PO Berns did not recall Taser training when another officer is near
- PO Berns considered DiFlorio merely walking away as fleeing and was trained the Taser may be deployed when a subject is fleeing
- MCPL Melvin did not plan or communicate with PO Berns to coordinate the use of defensive tactics
- MCPL Melvin lost his "hug" hold on DiFlorio because he incorrectly believed he could be "shocked" by the Taser during application
- Officers failed to provide DiFlorio or hospital staff with written police instructions/documents

The IAI did not address the medical reports which reported:

> needed to urinate, no physical complaints, laceration-contusions on face, abrasion on right elbow, appeared intoxicated, tasered in back with probes removed before arrival at hospital, head and neck injury (not appear serious), traumatic hematoma on forehead, disturbance of consciousness --**discharged**

Of special concern are the injuries to the neck and head.

Further the involved parties' weights were not factored in the force analysis-- Berns 230 pounds, Melvin 245 pounds, and DiFlorio 220 pounds. With a two-on-one operation, the weight comparison is 475 to 220 pounds, and considering the officers' combined strength, training and experience, the officers have some advantage.

**Supervision**

Also, the quality of supervision and attendant communications were not addressed. In both incidents on March 16 and 17, 2013 MCPL Melvin, as the senior officer was responsible for directing PO Berns and other officers on-scene and to plan and coordinate movements and actions for the safety of all parties, as reasonably appropriate.

**Training-Internal Affairs Unit (IAU) Interaction**

Policies and procedures are the foundation for training and
state **what** is to be done and **why**. It is the policymaker to
translate policies to be practiced by the officers, consistent
with the law and the policymaker's intentions.  Training is the
organizational function/activity that informs the officers **how**
to do what is expected.

In modern police administration, internal affairs and training
have a strong relationship.

**Opinion**:  Based on the evidence presented in this matter it is
clear the involved officers were inadequately trained and
unskilled in the use of force considering the totality of
circumstances presented to them at the time.

**Opinion**:  Since the IAU does not capture and analyze certain
critical information, the validity of DPD annual training is
questionable.

In response to DiFlorio's Citizen Complaint, an IAI was
conducted.  As a result, all IAI findinds for the involved
officers' Use of Force and/or Misconduct/Violating Department
Rules & Regulations were **Not Sustained** which means (Insufficient
evidence to either prove or disprove allegation).  Based on past
experience with the DPD these Not Sustained findings were not
surprising.

In <u>Dickerson v. Webster,</u> I presented a summary of Use of Force
cases reported in the DPD Internal Affairs Annual Reports which
is revealing.

| Year | Use of Force Cases Completed | Use of Force Cases Sustained |
|------|------|------|
| 2008 | 82 | 0 |
| 2009 | 104 | 0 |
| 2010 | 119 | 0 |
| 2011 | 88 | 0 |
| 2012 | 65 | 0 |
| 2013 | 62 | 0 |
| 2014 | 66 | 0 |
| Total | 586 | 0 |

> A zero percent Use of Force Case Sustain rate is
> problematic. Walker states, "Both internal and external
> complaint procedures sustain about 10-13% of all
> complaints." (Walker, Samuel, *The New World of Police
> Accountability*, Thousand Oaks, CA: Sage, 2005, p. 144). A
> zero sustain rate is an indicator of internal investigation
> bias in favor of the officer. This is an important issue
> that would likely be addressed by the inspection function.

The failure to sustain any complaints is the result of deficient
IAIs and a police culture that does not hold officers
accountable.

The fact that the DPD conducts formal IAI reports is
insufficient. In <u>Beck v. City of Pittsburgh</u> the Third Circuit
Court of Appeals said, "Formalism is often the last refuge of
scoundrels." That Court also said,

> The [internal] investigation process must be real. It must
> have some teeth. It must answer to the citizen by
> providing at least a rudimentary chance of redress when
> injustice is done. The mere fact of investigation for the
> sake of investigation does not fulfill a city's obligation
> to its citizens.

**Accountability**

A root problem in the DPD relevant to the instant matter is a
lack of police accountability. Walker states,

> The basic goal of the new police accountability is
> organizational change. This represents a significant
> shift from a long-standing police reform emphasis on
> individual officers, or what is often called the rotten
> apple theory of police misconduct. The rotten apple theory
> persists and motivates many community activists because it
> has powerful emotional and political appeal. It
> personalizes misconduct and gives it a human face.
> Unfortunately, it is simplistic and ineffective. Most
> important, it does not address the underlying
> organizational and management causes of unjustified
> shootings and persistent use of excessive force. The new
> accountability thinks instead in terms of "rotten barrels,"
> and directs its energies toward fixing the barrel. The
> changes involved, however, are decidedly lacking in
> emotional appeal: complex administrative procedures that
> have no human face, are difficult to implement and even

harder to maintain over the long term, and whose results
lie in the future rather than in the emotionally charged
present.  Firing a cop or a police chief has a certain
cheap appeal, and chiefs can be rather easily dismissed.
Far more difficult is the task of changing the culture of a
police department, in the sense of developing informal
norms of professional conduct and a habit of reporting and
investigating misconduct. (Walker, Samuel, *The New World of
Police Accountability*, Thousand Oaks, CA: Sage, 2005, p.
14)

**Opinion**: The DPD's policies and procedures, as practiced, do not
hold officers and supervisors accountable or allow the DPD to
make positive organizational change and ensure accountability
and transparency.

**Opinion**:  The DPD's failure to effectively train the involved
officer and his supervisor resulted in the lack of operational
discipline in these two police actions and was a substantial
factor causing the harm suffered by DiFlorio.  The failure to
train officers to the extent the officers acquire the essential
skills is contrary to accepted police administrative practices.

**Opinion**:  The deficiencies of the IAI in the instant matter
reflect a continuing pattern of investigatory conduct as
identified in Dickerson v. Webster that are substantial factors
preventing the DPD from recognizing and correcting officer
misconduct through training and discipline.

## H.   Best Practices:  United States Department of Justice (USDJ)

The USDJ police studies/reports and Consent Decrees since 1997
have established numerous "Best Practices" that are applicable
to the DPD.  As recently as March 2015 the USDJ published

George Fachner, Steven Carter.  *COLLABORATIVE REFORM
INITIATIVE:  An Assessment of Deadly Force in the
Philadelphia Police Department.*  Community Oriented
Policing Services, U.S. Department of Justice (DOJ), [March
2015

The following selected Recommendations and Findings regarding
the Philadelphia Police Department, with my commentary, are
relevant to this matter.

22

**Finding 30:** ... Officers who lack confidence in their ability to subdue a resistant or aggressive offender may be more likely to resort to excessive force or lethal options to gain compliance.

**Commentary:** PO Berns and MCPL Melvin as a coordinated two man team had the opportunity/options, if they had the ability/ training, to subdue DiFlorio without resorting to deploying the Taser to gain compliance.

Recommendation 40.2  **At a minimum communications, tactical decision-making, officer coordination [role of an OIC], tactical and verbal de-escalation, verbal commands, use of cover and concealment, less-lethal options, etc.**(Emphasis added)

**Commentary:** The IAI in the instant matter was deficient and did not reasonably address most of these issues.

Recommendation 15.2  PPD de-escalation training should be expanded to include a discussion of tactical de-escalation.

**Commentary:** PO Berns received "Verbal Judo" training in the academy which was a form of de-escalation training.  However, it is clear he lacked the skill to use that training.

**Finding 23:** ... officers do not regularly receive in-service training on threat perception, decision making, and    de-escalation.

- **Threat perception failures.** Officers should train in scenarios that allow them to hone their threat perception skills and better identify behavior such as "waistband-tugging" where no weapons are present and avoid mistaking cell phone or other shiny objects as firearms.

- **De-escalation.** Officers should be exposed to scenarios that allow them to exercise verbal persuasion and interpersonal communication skills with an agitated suspect.

**Commentary:** PO Berns incorrectly and unreasonably perceived DiFlorio as a threat and failed to use "Verbal Judo" to deescalate this unarmed subject situation.

The following commentary is from my August 24, 2015 report in Lateef Dickerson v. Cpl. Thomas W. Webster, et al.

**Commentary:**   Police policies and training are
inextricably related to police tactics,
threat perception, de-escalation and the use
of force/deadly force. It is abundantly
clear from the Use of Force Reports and
Internal Affairs Annual Reports, the DPD
provides a mere tally of use of force
reports (See DPD annual report Use of Force
Statistical Profiles) but the DPD
does not reasonably investigate police
tactics in the use of force to determine if
the officer(s) precipitated/created
unnecessary use of force/deadly force
situations.  This investigatory failure
hinders reasonable training of officers
regarding threat perception and tactics.
Combined, these failures allow officer
misconduct to continue undetected and/or
uncorrected providing a foundation for a
deviant police culture.

All of these best practices are applicable,
with variations, to the DPD and all police
departments in the United States.  For
example, in the instant matter the DPD
Personnel Early Warning System (PEWS)was
not effective because it did not provide
meaningful supervisory intervention to
control or change Pfc Webster's behavior or
enhance his skills.  Further, since DPD
policies and training do not provide
adequate guidance in field tactics (cover,
time, distance, tactical and verbal de-
escalation, threat assessment, and kicks, as
examples) the Internal Affairs
Investigations (IAI) do not address these
factors.  The DPD's longstanding and
deficient tactical and IAI practices have
minimized officer accountability and set
the stage for a deviant police culture.

Clearly, the DPD has written policies/general orders, an
internal affairs unit, a Personnel Early Warning System (PEWS),
trainers, supervisors, commanders, and other trappings of a
modern police department.  However, numerous practices and
customs of the DPD are contrary to their own policies and
accepted police practices.

24

## VII.   OPINIONS WITH RELEVANT COMMENTS

Based on my review of the above-listed materials, my experience and professional qualifications in criminology, criminal justice organizations, operations, and procedures, I offer, in addition to or with all opinions expressed above, the following opinions within a reasonable degree of professional certainty.

1.   The DPD policymaker acquiesced in his responsibilities to direct, train, supervise, and discipline officers and hold the involved officers accountable for their misconduct.

2.   The policies and customs of the DPD, as practiced, created an organizational culture that nominalized police accountability, transparency, and community trust.

3.   The actions and/or inactions of the involved officers, as discussed in this report were causes of the harms suffered by Mr. DiFlorio.

4.   The actions and/or inactions of the DPD, as discussed in this report, reflect a deliberate indifference to both officer and citizen well-being and safety and to organizational integrity and were causes of the harms suffered by Mr. DiFlorio.

Sincerely,

*/s/ R. Paul McCauley*

R. Paul McCauley, Ph.D., FACFE

Attachments

Copy of Curriculum Vitae – R. Paul McCauley, Ph.D., FACFE
Summary of Expert Experience
List of cases in which testimony was given the last four years

| Page: 1 | Report Date: 03/17/2013 | Agency: DO    PD | Complaint: 50-13-006747 |
|---|---|---|---|

| Reported Date and Time: AT 03/16/2013 2241 | Initial Crime Report | Occurred: SAT 03/16/2013 2241 |
|---|---|---|

ation: 140 S STATE ST SMITHERS   Dover, DE 19904

EXHIBIT 7
Berns
JS 1|11|17

M.O. and Incident Overview:
DEF RESISTED ARREST

| Grid 610-000 | Sector | County Kent | Domestic Related? ☐Yes ☒No | Gen Broadcast Sent? ☐Yes ☒No | Gang Related? ☐Yes ☒No | Gun Related? ☐Yes ☒No |
|---|---|---|---|---|---|---|

## Victim Information

| Victim Number 001 | Name | | | | |
|---|---|---|---|---|---|
| Type Society/Public | Sex | Race | Ethnic Origin | Age | D.O.B. |
| Address | | Resident Status | Home Telephone | Cell Phone | |
| Reporting Person? ☐Yes ☒No | Victim Injured? ☐Yes ☒No | Victim Deceased? ☐Yes ☒No | Officer Comments | | |
| Injuries | | Description of Injuries | | | |

## Suspect/Defendant Information

| Sequence 001 | Type Defendant | SBI Number 00738010 | | | | | |
|---|---|---|---|---|---|---|---|
| Name DIFLORIO, STEPHEN | | | | | | | Nick Name |
| Sex Male | Race White | Ethnic Origin Non-Hispanic | Age 20 | D.O.B. 10/14/1992 | Height | Weight | Skin Tone | Eye Color |
| Hair Color | Hair Length | Hair Style | Facial Hair | Voice Speech | Teeth | Build | Glasses |
| Disguise | Disguise Color(s) | | Resident Status Non Resident | Unusual Characteristics | Armed With Unarmed | | |
| Address 1522 E WINDBACK WAY EXTON, PA 19380 | | | Home Telephone | Cell Phone | | | |
| rest Number 586430 | Arrest Type Warrant | Suspect's Clothing Description | | | | | |

## Crimes and Associated Information

| Victim Number 001 | Crime Seq 001 | Statute DE:11:1257:000b:M:A | Crime Description Resisting Arrest | |
|---|---|---|---|---|
| Location Of Offense Bar/Nightclub | Status Adult Arrest 03/17/2013 | Involvement ☐Alcohol ☐Drugs ☐Computer | General Offense |
| Suspected Hate/Bias ☐Yes ☒No - N/A | Crime Code 4801 - Resisting Arrest | | |

| Victim Number 001 | Crime Seq 002 | Statute DE:04:0904:000F:M: | Crime Description Underage Possession/Consumption of Alcohol | |
|---|---|---|---|---|
| Location Of Offense Bar/Nightclub | Status Adult Arrest 03/17/2013 | Involvement ☐Alcohol ☐Drugs ☐Computer | General Offense |
| Suspected Hate/Bias ☐Yes ☒No - N/A | Crime Code 4298 - Consumption of Liquor/Underage | | |

| Victim Number 001 | Crime Seq 003 | Statute DE:11:1301:001A:M: | Crime Description Disorderly Conduct by Fighting or Violent Tumultuous or Threatening Behavior | |
|---|---|---|---|---|
| Location Of Offense Bar/Nightclub | Status Adult Arrest 03/17/2013 | Involvement ☐Alcohol ☐Drugs ☐Computer | General Offense |
| Suspected Hate/Bias ☐Yes ☒No - N/A | Crime Code 5316 - Disorderly Conduct/Liquor Involvement | | |

## Victim - Suspect/Defendant Relationships

| Victim - 001 Society/Public | |
|---|---|
| Suspect/Defendant - 001 DIFLORIO, STEPHEN | Victim Offender Relationship Victimless Crime |

## Witness Information

| Sequence 001 | Type Witness | Name MELVIN, MCPL | Sex Male | Race White | Age | D.O.B. |
|---|---|---|---|---|---|---|

A-092

| Reporting Officer | Supervisor Approval |
|---|---|

| Page: 2 | Report Date: 03/17/2013 | Agency: DO        PD | | | | mplaint: 50-13-006747 |
|---|---|---|---|---|---|---|

| Sequence ]1 Continued | | | Witness Information | | | | |
|---|---|---|---|---|---|---|---|

Address
400 S Queen ST
Dover Police Department
Dover, DE 19904 | Home Telephone | Cell Phone

| Sequence 002 | Type Witness | Name HOFFMAN, CPL | | Sex Male | Race White | Age | D.O.B. |
|---|---|---|---|---|---|---|---|

Address
400 S Queen ST
Dover Police Department
Dover, DE 19904 | Home Telephone | Cell Phone

| Sequence 003 | Type Witness | Name BARRETT, CPL | | Sex Male | Race White | Age | D.O.B. |
|---|---|---|---|---|---|---|---|

Address
400 S Queen ST
Dover Police Department
Dover, DE 19904 | Home Telephone | Cell Phone

| Sequence 004 | Type Witness | Name STUBBS, CPL | | Sex Male | Race White | Age | D.O.B. |
|---|---|---|---|---|---|---|---|

Address
400 S Queen ST
Dover Police Department
Dover, DE 19904 | Home Telephone | Cell Phone

| Sequence 005 | Type Witness | Name B WOOD, PFC | | Sex Male | Race White | Age | D.O.B. |
|---|---|---|---|---|---|---|---|

Address
400 S Queen ST
Dover Police Department
Dover, DE 19904 | Home Telephone | Cell Phone

| Sequence 006 | Type Witness | Name WILSON, PFC | | Sex Male | Race White | Age | D.O.B. |
|---|---|---|---|---|---|---|---|

Address
400 S Queen ST
Dover Police Department
Dover, DE 19904 | Home Telephone | Cell Phone

| Sequence 007 | Type Witness | Name BOESENBERG, PFC | | Sex Male | Race White | Age | D.O.B. |
|---|---|---|---|---|---|---|---|

Address
400 S Queen ST
Dover Police Department
Dover, DE 19904 | Home Telephone | Cell Phone

| Sequence 008 | Type Witness | Name T KNIGHT, PTLM | | Sex Male | Race Black | Age | D.O.B. |
|---|---|---|---|---|---|---|---|

Address
400 S Queen ST
Dover Police Department
Dover, DE 19904 | Home Telephone | Cell Phone

## Related Incident Information

Related Complaints
50-13-006747

## Investigative Narrative

ON 03/16/2013 AT APPROX 2241 HOURS WRITER, MCPL MELVIN, CPL HOFFMAN, CPL BARRETT, AND PFC B. WOOD OF THE DOVER POLICE DEPARTMENT RESPONDED TO 140 S. STATE ST (SMITHERS) FOR A REPORT OF A FIGHT.

WRITER CONTACTED A PATRON OF THE ABOVE MENTIONED BUSINESS AND SAME STATED THAT THE FIGHT WAS IN THE ALLEY ON THE SIDE OF THE ABOVE MENTIONED BUSINESS.

WRITER WALKED TO THE SIDE OF THE ABOVE MENTIONED BUSINESS AND DISCOVERED A W/M (LATER IDENTIFIED

A-093

| Reporting Officer | Supervisor Approval |
|---|---|

| Page: 3 | Report Date: 03/17/2013 | Agency: DO   PD | Complaint: 50-13-006747 |
|---|---|---|---|

### Investigative Narrative - Continued

SUSP(STEPHEN DIFLORIO)) WITH NO SHIRT ON AND PLACING HIS SHOES BACK ON HIS FEET.
SUSP(DIFLORIO) ALSO HAD BLOOD ON HIS HANDS AND FACE AND APPEARED TO HAVE JUST BEEN IN A PHYSICAL
ALTERCATION.

WRITER INSTRUCTED SUSP(DIFLORIO) TO COME TO WRITER TO WHICH SUSP(DIFLORIO) IGNORED AND BEGAN TO
WALKED TOWARDS THE REAR OF THE ABOVE MENTIONED BUSINESS.  WRITER AGAIN INSTRUCTED SUSP(DIFLORIO)
TO COME TO WRITER AND SUSP(DIFLORIO) AGAIN IGNORED WRITER AND CONTINUED TO WALK TOWARDS THE REAR
OF THE ABOVE MENTIONED BUSINESS.  MCPL MELVIN THEN ATTEMPTED TO PLACE SUSP(DIFLORIO) ON THE
GROUND.  SUSP(DIFLORIO) REFUSED TO GO TO THE GROUND AND SPUN HIS BODY TOWARDS MCPL MELVIN IN
WHAT WRITER BELIEVED TO BE A THREATENING GESTURE.  FROM THE POSITION THAT WRITTER WAS LOCATED IT
APPEARED TO WRITER THAT SUSP(DIFLORIO) AND MCPL MELVIN WERE IN A PHYSICAL STRUGGLE.  IN AN
EFFORT TO ASSIST MCPL MELVIN WRITER TASED SUSP(DIFLORIO) IN THE BACK WITH THE PROBES OF THE
TASER APPROX 1' APART.  SUSP(DIFLORIO) WAS ENERGIZED FOR A TOTAL OF 5 SECONDS.  DURING THE 5
SECOND ENERGIZING CYCLE SUSP(DIFLORIO) FELL TO THE GROUND AND STRUCK THE BACK OF HIS HEAD ON THE
CONCRETE CAUSING SUSP(DIFLORIO) TO BE KNOCKED UNCONSCIOUS FOR APPROX 5 MINUTES.  WRITER OBSERVED
BLOOD COMING FROM THE NOSE AREA OF SUSP(DIFLORIO) AND DO TO THE FACT THAT SAME WAS UNCONSCIOUS
WRITER CALLED FOR AN AMBULANCE TO EVALUATE SUSP(DIFLORIO).  ONCE THE AMBULANCE ARRIVED TO THE
SCENE SUSP(DIFLORIO) AWOKE AND WAS ESCORTED ONTO A STRETCHER TO BE PLACED ON THE AMBULANCE.
ABOVE MENTIONED OFFICERS OBSERVED TWO LARGE CONTUSIONS ON THE FOREHEAD OF SUSP(DIFLORIO) THAT
WERE A RESULT OF THE PHYSICAL ALTERCATION THAT SUSP(DIFLORIO) HAD GOTTEN INTO WITH THE UNK
PERSON(S).

WRITER RODE IN THE AMBULANCE WITH SUSP(DIFLORIO) TO KENT GENERAL HOSPITAL.  DURING THE RIDE TO
THE HOSPITAL SUSP(DIFLORIO) STATED TO WRITER THAT SAME HAD CONSUMED ALCOHOLIC BEVERAGES (BEER).
SUSP(DIFLORIO) IS UNDER THE LEGAL DRINKING AGE OF 21.

ONCE AT THE HOSPITAL WRITER AND CPL HOFFMAN ATTEMPTED TO SPEAK TO SUSP(DIFLORIO) ABOUT THE
PHYSICAL ALTERCATION THAT SAME WAS IN AT THE ABOVE MENTIONED BUSINESS.  SUSP(DIFLORIO) WAS
UNCOOPERATIVE IN CONVERSING ABOUT THE INCIDENT.  SUSP(DIFLORIO) WAS TREATED AT KGH FOR
CONTUSIONS TO HIS HEAD AND RESULTS FROM THE DOCTORS ARE STILL PENDING.

WRITER OBTAINED A WARRANT FOR SUSP(DIFLORIO) FOR DISORDERLY CONDUCT, RESISTING ARREST, AND
UNDERAGE CONSUMPTION.  SUSP(DIFLORIO) STATED THAT SAME WOULD TURN HIMSELF INTO THE DOVER POLICE
DEPARTMENT ONCE SAME WAS RELEASED FROM KGH.

ON 03/17/2013 AT APPROX 2000 HOURS WRITER RESPONDED TO KGH AND LEARNED THAT DEF(DIFLORIO) WAS

AR094

| Reporting Officer | Supervisor Approval |
|---|---|

| Page: 4 | Report Date: 03/17/2013 | Agency: DO   PD | mplaint: 50-13-006747 |

### Investigative Narrative - Continued

LEASED AT AN UNK TIME ON 03/17/2013 AND SENT HOME.  WRITER LEARNED ON 03/16/2013 THAT DEF(DIFLORIO) WAS STAYING AT 210 N.NEW ST.  WRITER AND SEVERAL OFFICERS OF THE DOVER POLICE DEPARTMENT RESPONDED TO THE THE ABOVE MENTIONED RESIDENCE TO TAKE DEF(DIFLORIO) INTO CUSTODY. SEE REPORT 50-13-6801 FOR REPORT OF RESISTING ARREST.

| Reporting Officer PTLM BERNS  - 09189 2 | | Supervisor Approval Andrew T Morris  OJDVATM  Date 03/20/2013 2056 |
| Detective Notified | Referred To | A-095 |
| Solvability Factors | ☐Witness | ☐M. O. | ☐Trace Stolen Property | ☐Suspect Named | Status |

EXHIBIT 8
Berns
JS 11/11/17

| age: 1 | Report Date: 03/17/2013 | Agency: DO' PD | | mplaint: 50-13-006801 |
|---|---|---|---|---|

| eported Date and Time 'UN 03/17/2013  2014 | Initial Crime Report | Occurred: SUN 03/17/2013  2014 |
|---|---|---|

ation: .10 N new ST    Dover, DE 19904

M.O. and Incident Overview:
DEF REFUSED TO COME OUT OF THE RESIDENCE WHEN OFFICERS ATTEMPTED TO SERVE A WARRANT

| Grid 810-000 | Sector | County Kent | Domestic Related ☐Yes ☐No | Gen Broadcast Sent? ☐Yes ☒No | Gang Related? ☐Yes ☒No | Gun Related? ☐Yes ☒No |
|---|---|---|---|---|---|---|

## Victim Information

| Victim Number 001 | Name | | | |
|---|---|---|---|---|

| Type Society/Public | Sex | Race | Ethnic Origin | Age | D.O.B. |
|---|---|---|---|---|---|

| Address | | Resident Status | Home Telephone | Cell Phone |
|---|---|---|---|---|

| Reporting Person? ☐Yes ☒No | Victim Injured? ☐Yes ☒No | Victim Deceased? ☐Yes ☒No | Officer Comments |
|---|---|---|---|

| Injuries | Description of Injuries |
|---|---|

## Suspect/Defendant Information

| Sequence 001 | Type Defendant | SBI Number 00738010 | | Nick Name |
|---|---|---|---|---|

| Name DIFLORIO, STEPHEN | | | | | |
|---|---|---|---|---|---|

| Sex Male | Race White | Ethnic Origin Non-Hispanic | Age 20 | D.O.B. 10/14/1992 | Height 6' 01" | Weight 215 | Skin Tone | Eye Color Hazel |
|---|---|---|---|---|---|---|---|---|

| Hair Color Brown | Hair Length | Hair Style | Facial Hair | Voice Speech | Teeth | Build | Glasses |
|---|---|---|---|---|---|---|---|

| Disguise | Disguise Color(s) | Resident Status Non Resident | Unusual Characteristics | Armed With Unarmed |
|---|---|---|---|---|

| Address 522 E WINDBACK WAY XTON, PA 19380 | Home Telephone | Cell Phone |
|---|---|---|

| rest Number 386429 | Arrest Type On View | Suspect's Clothing Description |
|---|---|---|

## Crimes and Associated Information

| Victim Number 001 | Crime Seq 001 | Statute DE:11:1257:00a1:F:G | Crime Description Resisting Arrest with force or violence that intentionally prevents or attempts to prevent a Peace Officer from effecting an arrest |
|---|---|---|---|

| Location Of Offense Residence/Home/Garage | Status Adult Arrest 03/17/2013 | Involvement ☐Alcohol ☐Drugs ☐Computer | General Offense |
|---|---|---|---|

| Suspected Hate/Bias ☐Yes ☒No - N/A | Crime Code 4801 - Resisting Arrest |
|---|---|

## Victim - Suspect/Defendant Relationships

| Victim - 001 Society/Public | |
|---|---|
| Suspect/Defendant - 001 DIFLORIO, STEPHEN | Victim Offender Relationship Victimless Crime |

## Witness Information

| Sequence 001 | Type Witness | Name MELVIN, MCPL | Sex Male | Race White | Age | D.O.B. |
|---|---|---|---|---|---|---|

| Address 400 S Queen ST Dover Police Department Dover, DE 19904 | Home Telephone | Cell Phone |
|---|---|---|

| Sequence 002 | Type Witness | Name HOFFFMAN, CPL | Sex Male | Race White | Age | D.O.B. |
|---|---|---|---|---|---|---|

| Address 400 S Queen ST Dover Police Department Dover, DE 19904 | Home Telephone | Cell Phone |
|---|---|---|

| .uence .03 | Type Witness | Name BOESENBERG, PFC | Sex Male | Race White | Age | D.O.B. |
|---|---|---|---|---|---|---|

A-096

| Reporting Officer | Supervisor Approval |
|---|---|

| Page:<br>2 | Report Date:<br>03/17/2013 | Agency:<br>DO   PD | | | | | mplaint:<br>50-13-006801 |
|---|---|---|---|---|---|---|---|

| Sequence<br>003 Continued | | | Witness Information | | | | |
|---|---|---|---|---|---|---|---|

ass<br>400 S Queen ST<br>Dover Police Department<br>Dover, DE 19904  |  Home Telephone  |  Cell Phone

| Sequence<br>004 | Type<br>Witness | Name<br>WILSON, PFC | | Sex<br>Male | Race<br>White | Age | D.O.B. |
|---|---|---|---|---|---|---|---|

Address<br>400 S Queen ST<br>Dover Police Department<br>Dover, DE 19904  |  Home Telephone  |  Cell Phone

| Sequence<br>005 | Type<br>Witness | Name<br>B WOOD, PFC | | Sex<br>Male | Race<br>White | Age | D.O.B. |
|---|---|---|---|---|---|---|---|

Address<br>400 S Queen ST<br>Dover Police Department<br>Dover, DE 19904  |  Home Telephone  |  Cell Phone

| Sequence<br>006 | Type<br>Witness | Name<br>T KNIGHT, PTLM | | Sex<br>Male | Race<br>Black | Age | D.O.B. |
|---|---|---|---|---|---|---|---|

Address<br>400 S Queen ST<br>Dover Police Department<br>Dover, DE 19904  |  Home Telephone  |  Cell Phone

### Investigative Narrative

ON 03/17/2014 AT APPROX 2207 HOURS WRITER RESPONDED TO KENT GENERAL HOSPITAL IN DOVER DELAWARE TO CHECK ON THE STATUS OF DEF(DIFLORIO) WHO HAD BEEN TAKEN TO THE HOSPITAL FOR INJURIES THAT SAME ENDURED TO THE FRONT OF HIS HEAD DURING A PHYSICAL ALTERCATION ON 03/16/2013.  WRITER SPOKE TO THE HEAD NURSE AND SAME STATED TO WRITER THAT DEF(DIFLORIO) WAS RELEASED FROM THE HOSPITAL AND SENT HOME WITH NO CRITICAL INJURIES TO HIS HEAD.

ON THE ABOVE MENTIONED DATE AT APPROX 2214 HOURS WRITER AND MCPL MELVIN OF THE DOVER POLICE DEPARTMENT RESPONDED TO 210 N. NEW ST IN AN ATTEMPT TO SERVE A WARRANT OBTAINED BY WRITER ON 03/16/2013 FOR DEF(STEPHEN DIFLORIO).  DEF(DIFLORIO) STATED TO WRITER ON 03/16/2013 THAT SAME WAS RESIDING AT THE ABOVE MENTIONED ADDRESS DO TO THE FACT THAT SAME WAS A STUDENT OF WESLEY COLLEGE.

MCPL MELVIN KNOCKED ON THE DOOR TO THE ABOVE MENTIONED RESIDENCE AND A W/M THAT THAT WAS BELIEVED TO BE DEF(DIFLORIO) LOOKED OUT OF THE WINDOW ATTACHED TO THE DOOR AND THEN SHUT THE BLINDS.  MCPL MELVIN ANNOUNCED HIMSELF AS A DOVER POLICE OFFICER AND INSTRUCTED THE W/M TO OPEN THE DOOR.  THE W/M IGNORED THE COMMAND AND THE DOOR REMAINED SHUT.

MCPL MELVIN CALLED OVER THE RADIO FOR MORE UNITS(PFC B. WOOD AND PLTM T. KNIGHT OF THE DOVER POLICE DEPARTMENT) TO COME TO THE ABOVE MENTIONED RESIDENCE DO TO THE FACT THAT THE W/M WOULD NOT OPEN THE DOOR. ONCE UNITS ARRIVED(CPL HOFFMAN, PFC BOESENBERG, PFC WILSON, PFC B. WOOD, AND PTLM T. KNIGHT OF THE DOVER POLICE DEPARTMENT) WRITER AND MCPL MELVIN INSTRUCTED THE W/M APPROX MORE TIMES TO OPEN THE DOOR AND THE W/M IGNORED ALL OF THE COMMANDS.  WRITER COULD HEAR MOVEMENT INSIDE OF THE RESIDENCE AND OBSERVED WINDOWS ATTEMPTING TO BE OPENED ON THE SOUTH SIDE OF THE RESIDENCE.

A-097

| Reporting Officer | Supervisor Approval |

| Page:<br>3 | Report Date:<br>03/17/2013 | Agency:<br>DO    PD | | | mplaint:<br>50-13-006801 |
|---|---|---|---|---|---|

Investigative Narrative - Continued

MCPL MELVIN ANNOUNCED AGAIN THAT HE WAS A DOVER POLICE OFFICER AND THAT THE W/M NEEDED TO OPEN
THE DOOR OR THE DOOR WAS GOING TO BE KICKED IN.  AGAIN THE W/M IGNORED THE COMMAND BY MCPL
MELVIN.  MCPL MELVIN ANNOUNCED ONCE AGAIN THAT THE W/M NEEDED TO OPEN THE DOOR OR THE DOOR WAS
GOING TO BE KICKED IN.

AFTER THE SECOND COMMAND TO OPEN THE DOOR OR SAME WAS GOING TO BE KICKED IN, THE W/M OPENED THE
DOOR TO THE RESIDENCE AND WRITER FROM IMMEDIATLY RECOGNIZED SAME AS DEF(STEPHEN DIFLORIO) DO TO
WRITERS PRIOR EXPERIENCE WITH SAME.  MCPL MELVIN ASKED DEF(DIFLORIO) IF HIS NAME WAS STEPHEN AND
SAME RESPONDED "YEA WHAT".  MCPL MELVIN STATED TO SAME THAT HE HAD A WARRANT FOR HIS ARREST AND
WENT TO GRAB DEF(DIFLORIO) IN AN ATTEMPT TO PLACE SAME IN HANDCUFFS TO TAKE INTO CUSTODY FOR THE
WARRANT THAT WRITER HAD OBTAINED FOR DEF(DIFLORIO).  DEF(DIFLORIO) PULLED HIS BODY AWAY FROM
MCPL MELVIN BACKING IT TOWARDS THE RESIDENCE IN AN ATTEMPT TO EVADE CAPTURE.

WRITER AND MCPL MELVIN THEN GRABBED ONTO DEF(DIFLORIO) AND WRITER AND MCPL MELVIN TOOK SAME TO
IE GROUND WITH DEF(DIFLORIO) LANDING ON HIS STOMACH OUTSIDE OF THE RESIDENCE AND PLACING HIS
.ANDS UNDERNEATH HIS BODY.  DEF(DIFLORIO) THEN CURLED HIS BODY INTO A BALL AND REFUSED TO GIVE
UP HIS HANDS TO OFFICERS.

ABOVE MENTIONED OFFICERS HAD TO PHYSICALLY PLACE DEF(DIFLORIO) HANDS BEHIND HIS BACK .
DEF(DIFLORIO) SEVERAL TIMES PLACED HIS HANDS BACK UNDERNEATH HIS BODY WHEN OFFICERS ATTEMPTED TO
PLACE HANDCUFFS ON HIM.  OFFICERS AFTER SEVERAL MINUTES OF STRUGGLING WITH DEF(DIFLORIO) WERE
FINALLY ABLE TO PLACE DEF(DIFLORIO) HANDS BEHIND HIS BACK LONG ENOUGH TO PLACE SAME IN HANDCUFFS.

DEF(DIFLORIO) WAS PLACED INTO WRITERS FULLY MARKED PATROL VEHICLE(275) AND ESCORTED TO THE DOVER
POLICE DEPARTMENT FOR PROCESSING.  AT A LATER TIME ON 03/18/2013 DEF(DIFLORIO) WAS TRANSPORTED
TO JP7 FOR ARRAIGNMENT.  DEF(DIFLORIO) RECEIVED $1675 SECURED BAIL AND WAS TRANSPORTED TO DCC BY
WRITER.

| Reporting Officer<br>PTLM BERNS  - 09189 2 | | Supervisor Approval<br>Andrew T Morris  OJDVATM  Date 03/20/2013 2245 | |
|---|---|---|---|
| Detective Notified | Referred To | | |
| Solvability Factors | ☐Witness | ☐M. O. | ☐Trace Stolen Property | ☐Suspect Named | Status |

A-098

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SHAWN RUSSELL,                                )
                                              )
            Plaintiff,                        )
                                              )
      v.                                      )  Civ. No. 15-860-SLR
                                              )
CORPORAL SUZANNE LOWMAN,                      )
TROOPER RYAN KIRCHENBAUER,                    )
CORPORAL ADALBERTO GARCIA,                    )
and SERGEANT JOHN LLOYD,                      )
                                              )
            Defendants.                       )

**MEMORANDUM**

At Wilmington this 10th day of February, 2017, having reviewed defendants' motion

for summary judgment and the papers submitted in connection therewith, the court

issues its decision based on the following reasoning:

1. **Background.** Plaintiff Shawn Russell ("plaintiff") filed a complaint against the

above named defendants related to his detention by police on September 25, 2013.

More specifically, plaintiff alleged in his complaint that, "[a]s a direct and proximate

result" of defendants' conduct, "committed under color of state law," he was

> deprived of his Fourth Amendment right to be free from unreasonable
> force, the excessive use of force, false arrest, illegal search and seizure,
> and to be secure in his person and property and he was deprived of his
> Fourteenth Amendment rights of being free from malicious prosecution
> and he was denied his liberty without due process of law. As a result,
> [he] suffered and continues to suffer harm in violation of his rights under
> the laws and Constitution of the United States, in particular the Fourth
> and Fourteenth Amendments thereof, and 42 U.S.C. [§] 1983.

(D.I. 1 at 8)  After the completion of discovery, defendants moved for summary

judgment.  The court has jurisdiction over the pending matters pursuant to 28 U.S.C. §§

1331 and 1343.

    2.  **Undisputed facts.**  On September 25, 2013, Sergeant John Lloyd

("defendant Lloyd"), the head of the Delaware State Police ("DSP") Drug Unit, received

information from a confidential informant that an individual named William Camp

("Camp") was distributing heroin in New Castle County, and that Camp would be

making a sale of heroin that night at a local restaurant.  Defendant Lloyd assembled a

stakeout crew of officers at the restaurant.  The officers first saw Camp's vehicle arrive.

They then saw a second vehicle (a Suburban) pull up in close proximity to Camp's car.

The Suburban left, and defendant Lloyd directed Corporal Adalberto Garcia ("defendant

Garcia") to follow.  The remaining officers proceeded to detain Camp.  Camp told the

officers that the driver of the Suburban had the drugs, and that Camp had directed him

to leave.  (D.I. 36[1] at 132-37; D.I. 47 at 2)

    3.  With that information, defendant Lloyd put a broadcast over the radio for

defendants Garcia, Corporal Suzanne Lowman ("defendant Lowman"), and Trooper

Ryan Kirchenbauer ("defendant Kirchenbauer") to stop the Suburban.  Defendants

Lowman and Kirchenbauer were in the same vehicle and heard the radio broadcast to

stop the Suburban as part of a drug investigation.  They activated their emergency

equipment and pulled the Suburban over on the right shoulder of west Route 273.  (D.I.

36 at 113-14, 137; D.I. 47 at 2)  "As part of the stop, Plaintiff's vehicle was searched. . .

---

    [1]Page numbers referenced are to the assigned A-#.

2

. After the vehicle stop and search, Plaintiff was transported to Delaware State Police Troop 2 Barracks." (D.I. 47 at 2) "While Plaintiff was detained at the barracks, he was subjected to a strip search and after approximately 30 minutes was released.  Several days after Plaintiff's release, Defendant Sergeant Lloyd applied for and obtained a warrant for Plaintiff's arrest charging him with possession of a controlled or counterfeit substance.  Plaintiff was later indicted by a Grand Jury on the same charge.   On April 14, 2014 the Attorney General for the State of Delaware nolle prossed all charges against the Plaintiff." (D.I. 47 at 3)

4.  Plaintiff and defendants have given different accounts of what happened during the stop and what happened at the police station where plaintiff was subsequently detained.  Plaintiff no longer disputes, however, that defendants "had a legitimate reason to stop" plaintiff's car, and that defendants had "cause to detain the plaintiff and bring him back to Troop 2 for questioning." (D.I. 38 at 7)

5.  **Standard of review.**  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 415 U.S. 475, 586 n. 10 (1986).  A party asserting that a fact cannot be—or, alternatively, is—genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not

3

establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 415 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).

6.   To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podohnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). Although the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," a factual dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

4

7. **Excessive force claims.** Plaintiff claims that one (or more) law enforcement officers at the stop struck him in the face, and that one of said officers grabbed plaintiff's face and put his hands in plaintiff's mouth while the other officers were striking plaintiff in the back. (D.I. 47 at 3) Defendants contend that no force was used on plaintiff at any time during the course of the stop. (*Id.*) The parties agree that plaintiff's excessive force claims "are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard," as articulated in *Graham v. Connor*, 490 U.S. 386, 388 (1989). In this regard, the Supreme Court explained in *Graham* that "[w]here, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." *Id.* at 394. Such excessive force claims, therefore, should be analyzed under the Fourth Amendment's "reasonableness" standard. *Id.* at 395.

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of "'the nature and quality of the intrusion of the individual's Fourth Amendment interest'" against the countervailing governmental interests at stake. . . . Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. . . . Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," . . . , however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. . . .
>
> The "reasonableness" of a particular use of force must be judged from the

> perspective of a reasonable officer on the scene, rather that with the 20/20
> vision of hindsight. . . .  The calculus of reasonableness must embody
> allowance for the fact that police officers are often forced to make split-
> second judgments – in circumstances that are tense, uncertain, and
> rapidly evolving – about the amount of force that is necessary in a
> particular situation.

*Id.* at 396-97 (citations omitted).

8.  As noted, plaintiff at bar claims that "one or more of the Defendant troopers struck him in the face, grabbed his face and put his hand in his mouth while another trooper was striking him in the back." (D.I. 47 at 3)  Plaintiff cannot identify specifically which officers landed which blows. He testified at his deposition, however, that he had not yet stopped the Suburban when the officers approached the vehicle, and that it was three Caucasian males who pulled him out of the Suburban allegedly with excessive force. (D.I. 36 at 47, 49)  Defendants deny using any kind of force on plaintiff, recalling the stop as uneventful and plaintiff as compliant. (*Id.* at 107, 117, 123)  Other than plaintiff's deposition testimony, there is no evidence[2] that any force, let alone excessive force, was exerted against plaintiff during the stop at issue.  The court must determine, therefore, whether plaintiff's deposition testimony should be deemed sufficient evidence to withstand a motion for summary judgment. If plaintiff were proceeding pro se, the answer probably would be "yes," as the Third Circuit has accepted an inmate's testimony as true for purposes of summary judgment, noting that "'an inmate who is proceeding pro se . . . is in a decidedly difficult position from which to generate 'record evidence' on his behalf . . . [and] under these circumstances, his affidavits . . . are about

---

[2]For example, there is no contemporary medical report describing injuries sustained at the time.

6

the best that can be expected from him [at the summary judgment phase of] the proceedings.'" *Robinson v. Beckles*, 2016 WL 7364148, at *2 (3d Cir. Dec. 19, 2016) (citation omitted). Plaintiff at bar, of course, has been represented by counsel and there has been a full opportunity for discovery. The only evidence presented in opposition to that presented by defendants - to wit, plaintiff's deposition testimony - adds nothing to the bare allegations of the complaint.

   9. The record does indicate that officers other than those named in the complaint may have participated in plaintiff's detention. (*See, e.g.,* D.I. 36 at 115, 124, 185-86) According to plaintiff, "[w]here the plaintiff has no recollection of the acts or was unable to observe what the officers were doing, the jury is entitled to draw reasonable inferences from circumstantial evidence," citing non-Third Circuit precedent such as *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1342 (11th Cir. 2007); *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000); and *Simpson v. Hines*, 903 F.2d 400, 403 (5th Cir. 1990). In these cases, there apparently was no dispute that the plaintiff was in fact attacked; the only question was whether the plaintiff had to identify which of several officers present at the scene landed the blows. As explained by the court in *Miller,*

> while it is true that a plaintiff must establish a defendant's personal responsibility for any claimed deprivation of a constitutional right, a defendant's direct participation in the deprivation is not required. . . . "An official satisfies the personal responsibility requirement of § 1983 if she acts **or fails to act** with a deliberate or reckless disregard of the plaintiff's constitutional rights." . . . Under this rule, police officers who have a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's rights through the use of excessive force but fail to do so have been held liable.

*Miller,* 220 F.3d at 495 (emphasis in original) (citations omitted). The facts at bar, of

7

course, are one step removed from those examined in the case law cited by plaintiff, as the use of force itself is disputed.

10.  In sum, the court is not addressing a motion to dismiss and, therefore, is not obligated to accept plaintiff's allegations as true.  Plaintiff had the opportunity to conduct discovery, and has presented nothing more than his allegations, albeit in the form of deposition testimony.  Under these circumstances and based on the record created during the litigation process, the court concludes that plaintiff has not presented sufficient evidence to enable a jury to reasonably find that the named defendants used excessive force during the September 25, 2013 stop.  Defendants' motion for summary judgment is granted in this regard.[3]

11.  **Remaining claims.** As the court understands these claims, plaintiff contends that, because no pills (illicit or otherwise) were found in the Suburban but, rather, were fabricated by defendant Lloyd, the strip search conducted at Troop 2, as well as his subsequent arrest and indictment are violative of plaintiff's constitutional rights.  (D.I. 47 at 5)  Plaintiff has conceded that "the statement made by Camp . . . gave the Defendants cause to detain the Plaintiff and bring him back to Troop 2 for questioning." (D.I. 38 at 7)  The record indicates that DSP policy includes the following guidance as to strip searches:  "A strip search will be utilized when the arresting officer reasonably suspects that weapons, contraband or evidence may be concealed upon

---

[3]In *Simpson*, cited by plaintiff, the court granted qualified immunity to an officer when there was "no indication whatever that he used any physical force against Simpson, let alone force that a reasonable officer would have known was excessive." 903 F.2d at 403.  Given plaintiff's admission that defendant Lowman had no role in the alleged forceful conduct (D.I. 36 at 56), the court also grants defendants' motion for qualified immunity as to defendant Lowman.

8

the person or in the clothing in such a manner that it may not be discovered by previous

search methods." (D.I. 36 at 153) The "Documentation Report" related to the strip

search of plaintiff provides the reason given for the search: "The defendant

[presumably plaintiff at bar] was found to be engaging in a suspected heroin

investigation. The amount of heroin being delivered, which was confirmed by the

defendant, was unable to be located. The defendant was being evasive in the alleged

location of the heroin, therefore a strip search was conducted. The defendant was

furthermore in possession of Oxycodone prescription medication." (*Id.* at 184) Plaintiff

was detained at Troop 2 from 2327 to 0008 on September 23-24, 2013; the search was

conducted between 2327 and 2331 on September 23, 2013. (*Id.*)

      12. The police report filled out by defendant Lloyd described what happened

during plaintiff's detention as follows:

> Upon arrival at Troop 2, I was notified that the pills located in the Suburban
> were identified as non-controlled prescription heart medication.[4]  At this point,
> I removed Russell from the Troop 2 holding cell area and conducted an
> interview with him. The interview was conducted on the basis of his being
> a witness to the Camp investigation. Russell denied the fact that he knew
> Camp and agreed his actions at TGIFriday's appeared suspicious. Russell
> reported he did not see anyone in the parking lot, therefore he left with the
> intent on going home. Russell stated the pills in the vehicle were not his.
> Russell was released from Troop 2.

(*Id.* at 158) According to plaintiff's deposition testimony, the Suburban did not belong to

him but, rather, it belonged to a friend named Sherry Williams. (*Id.* at 34-36)

According to defendant Lloyd, he interviewed plaintiff before he interviewed Camp; it

was only after plaintiff's interview that Camp recanted any involvement of plaintiff in the

---

    [4]Defendant Garcia has no recollection of either finding the pills or of identifying
them. (D.I. 36 at 107)

heroin transaction.  Subsequent to plaintiff's release, defendant Lloyd looked up the pills found in the Suburban, and saw that they were Oxycodone.  (*Id.* at 142, 159)  A warrant issued for plaintiff's arrest, based on a probable cause finding that plaintiff possessed five Oxycodone pills, a Schedule II narcotic, while operating a 2004 Chevrolet Suburban.  (*Id.* at 147-50)  An indictment was returned having the same charge, which charge was later dismissed.

13.  The court recognizes that the probable cause findings that supported the arrest warrant and indictment in this case are a sufficient basis to grant defendants' motion for summary judgment on plaintiff's false arrest and malicious prosecution claims, *see Doe v. Attorney General of U.S.*, 659 F.3d 266, 273 at n.4 (3d Cir. 2011), or, alternatively, on defendants' motion for qualified immunity as to defendant Lloyd, *see Malley v. Briggs*, 475 U.S. 335, 345 (1986).  There is also no evidence that plaintiff suffered a deprivation of liberty after the issuance of the arrest warrant.  *See DiBella v. Borough of Beachwood*, 407 F.3d 599, 601 (3d Cir. 2005).  With respect to plaintiff's allegations that defendant Lloyd fabricated evidence to support the arrest warrant and indictment, the court notes, first, that defendant Garcia's lack of recollection is "insufficient to raise a genuine issue of material fact." *Metlife Securities, Inc. v. Holt*, 2016 WL 6683586, at 4 (E.D. Tenn. 2014).  Moreover, the Third Circuit opinion upon which plaintiff bases his fabrication of evidence claim is not on all fours with the facts of this case, where plaintiff was never tried for the drug charge at issue and the harm addressed by the Third Circuit in *Black v. Montgomery Cty.*, 835 F.3d 358, 371 (3d Cir. 2016), as amended (Sept. 16, 2016), was corruption of the trial process.  I decline to

10

extend the reasoning in *Black* to the facts of record.

14.  The court does find genuine issues of material fact regarding the strip search, not as to how it was conducted but whether it was justified in the first instance. The record is replete with inconsistencies in this regard.  Specifically, the "Documentation Report" related to the strip search is completely at odds with defendant Lloyd's police report and its chronology, as well as with defendant Lloyd's deposition testimony.[5]  As noted by plaintiff, strip searches are the most intrusive of searches conducted by governmental officials, and courts have "understood that the humiliating and essentially non-productive practice of strip searching pre-arraignment arrestees not held in the general population is an unreasonable search under the Fourth Amendment in the absence of reasonable suspicion." *Johnson v. Government of District of Columbia*, 734 F.3d 1194, 1206 (D.C. Cir. 2013) (Rogers concurring).  Viewing the record in the light most favorable to plaintiff, the non-moving party, the court finds genuine issues of material fact as to whether defendant Lloyd had reasonable suspicion to believe that plaintiff was hiding contraband or other evidence.  Defendants' motion for summary judgment is denied in this regard as to defendant Lloyd.

15.  **Conclusion.**  For the reasons stated, defendants' motion for summary

---

[5]For instance, the justification for the strip search identifies plaintiff as a suspect who "confirmed" the fact that heroin was being delivered, but was "evasive" about the heroin's location.  Plaintiff was described in the "Documentation Report" as being in possession of Oxycodone.  (D.I. 36 at 184)  In contrast, defendant Lloyd's summary of his interview with plaintiff described plaintiff as a witness and the pills as heart medication, thus justifying plaintiff's release; the pills were not identified as Oxycodone until after plaintiff's release.  (*Id.* at 158)

judgment is granted,[6] except for plaintiff's Fourth Amendment claim against defendant Lloyd relating to the strip search.  An order shall issue.


_____
Senior United States District Judge


---

[6]Plaintiff apparently is not pursuing his state law claims and, therefore, the court will not address them in this memorandum.

12

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SHAWN RUSSELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 15-860-SLR |
| | ) | |
| CORPORAL SUZANNE LOWMAN, | ) | |
| TROOPER RYAN KIRCHENBAUER, | ) | |
| CORPORAL ADALBERTO GARCIA, | ) | |
| AND SERGEANT JOHN LLOYD, | ) | |
| | ) | |
| Defendants. | ) | |

## O R D E R

At Wilmington this 10ʳᵈ day of February 2017, consistent with the memorandum

issued this same date;

IT IS ORDERED that defendants' motion for summary judgment (D.I. 34) is

granted, except for plaintiff's Fourth Amendment claim against defendant Seargeant

John Lloyd relating to the strip search.


_____
Senior United States District Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SHAWN RUSSELL,                          )
                                        )
          Plaintiff,                    )
                                        )
     v.                                 )   Civ. No. 15-860-SLR
                                        )
SERGEANT JOHN LLOYD,                    )
                                        )
          Defendant.                    )

**MEMORANDUM**

At Wilmington this 23rd day of May, 2017, having conducted a bench trial on the

issues remaining after the summary judgment exercise in the above captioned case

(*see* D.I. 51-53), and after reviewing the evidence presented and the parties' post-trial

submissions (*see* D.I. 55-56), the court issues its decision to enter judgment in favor of

defendant and against plaintiff based on the reasoning that follows:

1. **Background.**[1]  As related above, the court issued its summary judgment

decision on February 10, 2017, and left only one issue for trial - plaintiff's Fourth

Amendment claim relating to the strip search conducted at Troop 2 the night of

plaintiff's arrest.  The parties opted to have this single issue tried to the bench rather

than to a jury.  (D.I. 53)  Trial was conducted on February 27, 2017.[2]  Plaintiff did not

---

[1]The court assumes familiarity with the facts, as related in the summary
judgment decision issued February 10, 2017.  (D.I. 51)

[2]The instant memorandum constitute the court's findings of fact and conclusions
of law, pursuant to Fed. R. Civ. P. 52.  The court has jurisdiction to render its decision
pursuant to 28 U.S.C. § 1331.

dispute at trial that the police had probable cause to detain plaintiff and bring him back to Troop 2 for questioning. (D.I. 51 at 3; D.I. 57 at 4-5) Therefore, the court will not reiterate the facts leading up to plaintiff's arrest.

2. **Legal standard.** It is plaintiff's burden to prove, by a preponderance of the evidence, that the strip search at issue violated his Fourth Amendment right to be free from the use of excessive force. The Supreme Court has explained its Fourth Amendment jurisprudence in terms of balancing "the nature and quality of the intrusion" against the recognition that "some degree of physical coercion or threat thereof to effect it" may be necessary when making an arrest or investigatory stop. *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). The Third Circuit has also recognized that a search incident to a lawful arrest is lawful, even when a strip search is conducted. *See United States v. LePree*, 434 F.2d 1034, 1036 (3d Cir. 1970); *Harrison v. Christopher*, 489 F. Supp. 2d 375, 380 (D. Del. 2007).

3. **Analysis.** The question before the court is whether the probable cause that supported plaintiff's arrest and transportation back to Troop 2 somehow dissipated by the time he arrived at Troop 2 and was strip searched. The record demonstrates that, by the time plaintiff was transported to Troop 2, he had already been patted down and his vehicle searched with no result, leaving only the statement incriminating plaintiff made by the original suspect (William Camp) after Camp had been apprehended. According to plaintiff, because the statement was "inherently untrustworthy," there was no longer probable cause to undertake a strip search, described by plaintiff as "an extreme intrusion and a unique personal violation." (D.I. 56 at 5-6, citing *Lilly v.*

2

*Virginia,* 527 U.S. 116, 133 (1999), for the proposition that "an accomplice's statements
that shift or spread the blame to" another are insufficiently reliable to be admitted in
evidence).

    4.  The reason the court denied summary judgment to defendant in the first
instance was because the contemporary paperwork completed at Troop 2 contained
inconsistent statements relating to what the police officers knew and when by the time
plaintiff arrived at Troop 2.  (*Compare, e.g.,* PX 1 with DX 5 with DX 3[3])  Defendant
concedes the inaccuracies in the paperwork related to the incident at issue,[4] but
contends that (notwithstanding such) "the legality of the strip search is viewed under the
objective facts available to law enforcement at the time of the search."  (D.I. at 8, citing
*Ornelas v. United States,* 517 U.S. 690, 696 (1996) ("[P]rincipal components of a
determination of . . . probable cause will be the events which occurred leading up to the
stop or search, and then the decision whether these historical facts, viewed from the
standpoint of an objectively reasonable officer, amount to . . . probable cause.  The
first part of the analysis involves only a determination of historical facts, but the second
is a mixed question of law and fact."))

    5.  The only basis for the stop and arrest was Camp's statement incriminating
plaintiff.  By the time plaintiff arrived at Troop 2, he had been patted down and his

---

    [3]The guidance provided by the Delaware State Police in this regard is that "[a]
strip search will be utilized when the arresting officer reasonably suspects that
weapons, contraband or evidence may be concealed upon the person or in the clothing
in such a manner that it may not be discovered by previous search methods."  (DTX 3)

    [4]Of course, such careless records detract from the public's confidence in law
enforcement.

vehicle searched, with no heroin or other evidence of drug dealing found.  The court

concludes that whatever weight was given to Camp's statement in the first instance, its

trustworthiness should have been questioned when neither the pat-down nor the

vehicle search resulted in evidence consistent with Camp's accusation that plaintiff had

the heroin.  Such reasoning leads to the conclusion that the probable cause basis for

the stop, initial search, and arrest was no longer a sufficient basis to conduct a strip

search of plaintiff at Troop 2.

6.  Notwithstanding the above conclusion, judgment will be entered in

defendant's favor and against plaintiff on the grounds of qualified immunity.  The

doctrine of qualified immunity protects a law enforcement officer from civil damages

unless he violated a constitutional right that was clearly established. *Reichle v.*

*Howards*, 566 U.S. 658 (2012).  The doctrine of qualified immunity protects "all but the

plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563

U.S. 731, 743 (2011).  As of 2013, there was no controlling case law that prohibited a

police officer from requesting a strip search of a drug suspect when there was probable

cause for the arrest of that suspect, as recognized by the Third Circuit in *LePree*, 434

F.2d at 380.  Moreover, the strip search at issue was completed in less than five

minutes.  For all of these reasons, the court concludes that defendant would not have

been sufficiently on notice that the ordered strip search of plaintiff would have violated

the Fourth Amendment.

7.  **Conclusion.**  For the reasons stated, judgment will be entered in favor of

4

defendant John Lloyd and against plaintiff Shawn Russell.  An order shall issue.


_____
Senior United States District Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SHAWN RUSSELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 15-860-SLR |
| | ) | |
| SERGEANT JOHN LLOYD, | ) | |
| | ) | |
| Defendant. | ) | |

**O R D E R**

At Wilmington this 23rd day of May, 2017, consistent with the memorandum issued this same date;

IT IS ORDERED that the Clerk of Court shall enter judgment in favor of defendant Sergeant John Lloyd and against plaintiff Shawn Russell.

IT IS FURTHER ORDERED that, consistent with the memorandum and order issued February 10, 2017 (D.I. 51-52), the Clerk of Court shall enter judgment in favor of defendants Corporal Suzanne Lowman, Trooper Ryan Kirchenbauer, and Corporal Adalberto Garcia and against plaintiff Shawn Russell.

_____
Senior United States District Judge

A-117

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **STEPHEN DIFLORIO,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **C.A. No. 1:15-cv-00186-GMS** |
| **v.** | : | |
| | : | |
| **CITY OF DOVER, et al.** | : | |
| | : | |
| **Defendants.** | : | |

## CERTIFICATE OF SERVICE

I, Daniel A. Griffith, Esquire, certify that on this 14th day of July, 2017, a true and correct copy of the foregoing Defendants' Appendix to Opening Brief in Support of Their Motion for Summary Judgment was served upon all counsel of record electronically via CM/ECF.

**WHITEFORD TAYLOR & PRESTON LLC**

*/s/ Daniel A. Griffith*
Daniel A. Griffith, Esq. (ID #4209)
Kaan Ekiner, Esq. (ID #5607)
The Renaissance Centre
405 N. King Street, Suite 500
Wilmington, DE 19801
Telephone: (302) 357-3254
Facsimile: (302) 357-3274
dgriffith@wtplaw.com
kekiner@wtplaw.com
*Attorneys for Defendants*